**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARA A. BURKE,
                  *Plaintiff-Appellant,*

v.

PITNEY BOWES INC. LONG-TERM
DISABILITY PLAN,
                  *Defendant-Appellee.*

No. 06-15341

D.C. No.
CV 04-4483 MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted
December 7, 2007—San Francisco, California
Submission Withdrawn January 24, 2008
Resubmitted July 17, 2008

Filed September 19, 2008

Before: Betty B. Fletcher, A. Wallace Tashima, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Tashima

13299

## COUNSEL

Constantin V. Roboostoff, Roboostoff & Kalkin, San Francisco, California, for the plaintiff-appellant.

Nicole A. Diller, Morgan Lewis & Bockius, San Francisco, California, for the defendant-appellee.

## OPINION

TASHIMA, Circuit Judge:

Cara Burke appeals the district court's order granting summary judgment to Pitney Bowes Inc. Long-Term Disability Plan on Burke's claims arising from the Plan Employee Benefits Committee's termination of her long-term disability benefits. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we vacate and remand for further proceedings consistent with this opinion and the Supreme Court's recent decision in *Metropolitan Life Insurance Co. v. Glenn*, ___ U.S. ___, 128 S.Ct. 2343 (2008).

## I.

## BACKGROUND

### A.  Facts

Burke was hired by Pitney Bowes Management Services ("Pitney") as a sales employee in December 1995 and qualified for coverage under Pitney's Long-Term Disability Plan (the "Plan"). The Plan is subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 *et seq.* The Plan's Employee Benefits Committee (the "Committee") is responsible for the Plan's general administration,[1] while Pitney's Disability and

---

[1]The record does not disclose the Committee's makeup, but the parties argue the case on the assumption that it is a "management" committee controlled by the employer and we accept that assumption.

Benefits Department is delegated the day-to-day responsibilities. The Committee is the final decision-maker regarding benefits eligibility.

Benefits paid out by the Plan come from the Plan's Trust, which is funded in part by Pitney and in part by employee contributions. The Committee has the authority to determine the amounts of the employer and employee contributions to the Trust, but it is unclear from the record what portion of the Trust is funded by the employees, as opposed to by Pitney. The Trust fund is a Voluntary Employees' Beneficiary Association ("VEBA") Trust;[2] therefore, the money paid into the Trust cannot revert back to Pitney.

In June 1998, Burke was injured in a work-related accident, which caused her back and neck injuries, and caused her to miss five days of work. One month later, Burke was injured again in a car accident, this time not work-related. The second accident aggravated the injuries from the earlier accident, and Burke was subsequently diagnosed with multilevel lumbar degenerative disc disease, spinal stenosis, and lumbar radiculopathy.[3] Burke went on disability leave on October 26, 1998, and has not since returned to work.

Burke asserts that she requested a claim form to apply for long term disability ("LTD") benefits under the Plan in March 1999.[4] The Plan, however, contests that Burke requested a claim form at that time, and responds that she did not actually request a LTD claim form until September 10, 2000. On Sep-

---

[2]*See* 26 U.S.C. § 501(c)(9); Treas. Reg. § 1.501(c)(9)-1.

[3]Burke received workers compensation benefits following those accidents.

[4]A September 10, 2000, letter indicates that Burke requested a claim form in 1999. This letter, however, was excluded from evidence by the district court, along with other documents, because the district court found that those documents were not part of the administrative record. *See* Part III.B, *infra*.

tember 22, 2000, the Plan responded to Burke's request by asserting that Burke was not eligible for benefits under section 5.8(j) of the Plan because her disability was excluded as a work-related injury.[5] On May 8, 2001, the Plan provided Burke's counsel with the requested LTD claim form, stating:

> [The Plan] conditions the payment of long term disability ("LTD") benefits on the employee having first completed 22-weeks of short term disability ("STD"). As further mentioned, we have no record of Ms. Burke's filing a claim with Pitney Bowes for STD benefits. . . . Notwithstanding that Ms. Burke failed to file an STD claim with Pitney Bowes and that the deadline for filing such claim has long since expired, we will allow Ms. Burke to file a claim for LTD benefits.

Burke submitted her LTD claim in June 2001. Burke's LTD claim was denied by the Plan, which determined that Burke's injuries were excluded from coverage as a work-related injury. Burke filed a lawsuit in the Northern District of California under ERISA on May 20, 2002, and on September 26, 2002, Burke and the Plan reached a settlement in which the Plan agreed to pay Burke LTD benefits. The settlement agreement provided that Burke would receive:

> monthly long-term disability benefits pursuant to the terms, process and procedures of the Plan, as long as she continues to meet the Plan's definition of "Total Disability" and otherwise remains eligible under the Plan. This provision is in no way meant to alter or modify the terms, process or procedures set forth in the Plan for receiving benefits under the Plan.

---

[5]Section 5.8(j) provides that "no Monthly Disability Income shall be payable to a Participant if it is determined that such Participant's Total Disability: . . . (j) was due to occupational or work-related injury or illness."

Burke's eligibility for future benefits will be solely governed by the terms, process and procedures of the Plan and ERISA. Accordingly, this Agreement does not guarantee Burke any future long-term disability benefits except as determined by the Plan administrator under the terms, process, and procedure of the Plan and ERISA.

In September 2003, the Plan's physician-consultant, Dr. Broder, requested that Dr. Barry perform an independent medical examination ("IME") of Burke to determine whether she met the Plan's definition of "Totally Disabled." Section 2.33(a) defines a Participant as being "Totally Disabled" or having a "Total Disability" as:

Participant is unable (a)(i) to perform the material duties of his or her own occupation for a maximum period of twelve (12) months after the Qualifying Period, and (ii) that thereafter the Participant is unable, because of injury or illness, to engage in any gainful occupation or profession for which he is, or could become, reasonably suited by education, experience or training; provided, however, that the amount of earnings that the Participant would receive from engaging in such occupation or profession would be less than sixty percent of the Participant's annual or annualized earnings immediately prior to the event giving rise to the Total Disability.

Dr. Barry examined Burke on October 9, 2003. His report stated:

My impression is that Ms. Burke has an objectively normal physical and neurologic examination, but she demonstrates a very high level of self-perceived impairment. At this point, it appears that her described pattern of subjective symptoms are unsupported by any abnormal objective physical or neuro-

logic findings. . . . Given Ms. Burke's objectively normal evaluation, I feel she can return to light work at the current time, with no lifting, pushing or pulling over 30 pounds, and no repeated bending.

On November 3, 2003, the Plan notified Burke that it was terminating her benefits because it determined that she was not "totally disabled for any occupation as defined in Section 2.33(a) of the Plan."[6]

On January 6, 2004, Burke appealed the Plan's decision and requested that the Plan produce "all documents or other writings which were submitted, considered, or generated in the course of making the decision to terminate Ms. Burke's benefits, without regard to whether such document, record, or other information was relied upon in making the benefit determination."

On February 6, 2004, the Plan produced some of the documents requested in Burke's January 6, 2004 letter, but added that:

> All "correspondence, memoranda, notes or other materials" in Ms. Burke's disability claim's file relating to the decision to terminate benefits on November 1, 2003 [have been enclosed with this correspondence. However,] I have not included documents "submitted, considered or generated" in connection with the October 2001 decision to deny disability benefits (resulting in the Settlement Agreement, dated September 26, 2002). Ms. Burke or your

---

[6]In making this determination, the Plan relied primarily on a review of medical information from Dr. Barry, although the notification indicated that the Plan also considered a report from Dr. Gypson. Dr. Gypson, who was one of Burke's treating physicians, reported that Burke can read and write but is restricted because she cannot sit or walk for more than fifteen minutes or lift more than fifteen pounds.

office submitted the majority of such documents, and I assume you retained copies. Nonetheless, copies will be sent upon request.

On March 4, 2004, the Plan wrote to Burke's counsel, first stating:

[T]here are no "additional materials or information necessary" for Ms. Burke to perfect her claim. We have all materials necessary for the Employee Benefits Committee to review Ms. Burke's appeal of the termination of [LTD] benefits. That said, the Committee would consider any additional information not previously provided in support of Ms. Burke's position that she is "Totally Disabled" as defined in the [Plan].

The Plan also wrote, again, that the Plan did not provide Burke with the documents related to the 2001 decision to deny Burke benefits because the Plan assumed Burke had retained copies, but noted that the Plan would send Burke copies if she so requested. The Plan added that it was enclosing the documents provided by Dr. Broder to Dr. Barry in connection with the latter's October 2003 IME, and that "the majority of those documents are already part of Ms. Burke's file (submitted by Ms. Burke prior to the September 26, 2002 Settlement Agreement)."

On May 5, 2004, Burke's counsel provided the Plan's counsel with copies of medical reports prepared by Dr. Zwerin and a Functional Capacity Evaluation ("FCE") prepared by Lok Chan, an occupational therapist. Dr. Zwerin determined that Burke was incapable of returning to work because of an "[i]nability to engage in employment at any level due to being bed bound for up to a week at a time, 3-4 days a week regularly secondary to sciatica and back pain" and an "[i]nability to engage in work at a desk without stand-

ing or walking or lying down every 10-15 minutes for 30-45 minutes." Dr. Zwerin also stated:

> Dr. Barry's preposterous conclusions aside, Ms. Burke has objective findings on MRI and discography which are entirely compatible with her clinical presentation. Her imaging studies demonstrate findings which also conform to her complaints. Ms. Burke's pain drawing today shows none of the histrionics which Dr. Barry apparently used as the basis for his conclusions. . . . Aside from Dr. Barry, no physician has suggested that she is lying, hysterical or engaging in symptom magnification. Given that he saw her on but one occasion and at least 4 other physicians have seen her on multiple occasions with observations reinforced by an entire team of PhD, PT/OT and other professionals without anyone ever concluding that her presentation was other than legitimate, the conclusions of Dr. Barry are clearly devoid of legitimacy.

Similarly, Chan stated:

> Ms. Burke is unable to tolerate prolonged static sitting or standing positions. She requires frequent changes and shifting of positions to remain comfortable. Based on the results of this FCE, Ms. Burke currently is unable to return to any type of gainful employment. She does not meet any of the physical demand characteristics of work as defined by the Department of Labor.

After reviewing Chan's FCE, Dr. Zwerin reported "I had believed Ms. Burke was incapable of returning to the workforce. This evaluation is certainly in accord with my findings on clinical examination. Thus I would conclude that the FCE findings are in concert with my own opinions on this matter."

The Plan's counsel acknowledged receipt of those reports on May 20, 2004, and requested an independent FCE to corroborate the evidence. An independent FCE by PhysioMetrics, Inc. was conducted on June 28, 2004 in Burke's home, and concluded that Burke:

> demonstrated a SUB-CONSISTENT effort. The effort was less than consistent; however, the individual's true functional capacity is likely to be close to the actual abilities demonstrated during the FCE. . . . Ms. Burke lifted to the SEDENTARY level for waist to overhead lifting. Ms. Burke did not, however, participate in the floor to waist lifting. As such, we are unable to document her overall work level classification as defined by the U.S. Department of Labor in the Dictionary of Occupational Titles. This does not suggest, however, that Ms. Burke does not have a work level classification. Rather, we are simply unable to establish one at this time based on the results of the FCE. Further, according to the published research, most SEDENTARY level jobs simply require a tolerance for sitting and hand use, both of which Ms. Burke demonstrated. . . . There was no job analysis available for Ms. Burke. If a job analysis is available, the results of this FCE can be used to determine safe return to work levels and to set rehabilitation goals. At a minimum, Ms. Burke can at least work at the levels identified within this report.

On July 6, 2004, the Plan notified Ms. Burke of its request that Dr. Barry review the FCE report and perform an orthopedic spinal evaluation of Burke on August 23, 2004, noting that it intended to present Burke's appeal to the Committee in September, provided that it received Dr. Barry's report by that time. Burke's counsel responded by stating that Burke would not submit to another examination by Dr. Barry, calling the requested examination unreasonable and unnecessary because

Dr. Barry had already expressed his opinion of Burke's condition.

On July 20, 2004, the Plan informed Burke's counsel that "refusing to attend the evaluation provides procedural grounds for benefits termination (pursuant to Section 5.7(d) of the [Plan])."[7] Burke's counsel again stated that the requested evaluation was unreasonable.

Although Dr. Barry did not personally examine Burke a second time, he reviewed the FCE conducted by PhysioMetrics, the report from Dr. Zwerin, and a report from Dr. Wolfe from May 17, 2004, and concluded:

> I stand by my report of October 9, 2003, in which I felt Ms. Burke had a described pattern of subjective symptoms, which were, on the whole, unsupported by abnormal objective physical or neurologic findings. . . . Certainly, there has been no testing to suggest that Ms. Burke has objective residuals from what apparently were low-impact-energy rear-end motor vehicle accidents in June and July 1998, six years ago.

---

[7]Section 5.7 states:

> [T]he Monthly Disability Income payable to a Participant may be suspended or discontinued if the Participant: . . . (d) refuses to attend an independent medical examination which is scheduled within a reasonable distance from the Participant's primary residence or for which the Company has made reasonable arrangements for the Participant to attend; (e) is no longer Totally Disabled.

In addition, Section 5.8 states:

> [N]o Monthly Disability Income shall be payable to a Participant if it is determined that such Participant's Total Disability: . . . (h) cannot be verified to the satisfaction of the Disability Department because the Employee fails to undergo or complete one or more independent medical exams with a licensed physician or clinical psychologist prescribed by the Committee.

On September 27, 2004, the Committee met to consider Burke's appeal, and determined that:

> Ms. Burke's refusal to attend a second IME with Dr. Barry was a violation of the LTD plan [Section 5.7(d)] giving rise to a procedural ground for denial of benefits. The members found the IME request to be reasonable given the new medical reports and FCE submitted by Ms. Burke in support of her appeal, the dated nature of the prior IME, and the fact that the Disability Department had arranged transportation for Ms. Burke to and from the IME, which was a reasonable distance from Ms. Burke's home. The Committee further agreed that Ms. Burke's initial and current claim were not submitted within the LTD Plan's time limitations [under Section 5.4(a)[8]], which provided another basis for the denial of the appeal. In addition to finding procedural grounds for the denial of LTD benefits, the Committee felt denial was appropriate based on Ms. Burke's physical condition. The members were not persuaded by the evidence submitted by Ms. Burke regarding her inability to work. The Committee

---

[8]Section 5.4 states:

[T]he payment of benefits under the Plan is subject to the following: (a) An Employee must support his or her initial claim for benefits by submitting, in a form and manner determined by the Disability Department, written proof substantiating the occurrence, character and extent of the disability before the expiration of the one year period commencing on the date of Total Disability. Thereafter, as requested by the Disability Department from time to time, the Employee may be required to submit conclusive medical evidence of the continuance of his or her Total Disability. As a condition to the payment of benefits under the Plan, the Disability Department shall have the right to direct such employee to submit from time to time to an independent medical examination by a licensed or board certified physician or clinical psychologist designated by the Disability Department and/or follow a prescribed treatment program.

found Dr. Barry's IME . . . to be more credible than the opinion of Dr. Zwerin. The members were moved by the fact that Ms. Burke's physician, Dr. Gypson, reported that she could perform activities of daily living with some limitations. . . . Based on the various medical reports and other materials in the file, including the reports of Drs. Barry and Gypson, the Committee found Ms. Burke capable of performing 'light work,' as defined by the US Department of Labor. Finally, the Committee felt Ms. Burke did not provide evidence sufficient to establish that her injuries were not subject to the LTD Plan's exclusion of disabilities caused by a work-related injury. Upon return to the workforce, the members found Ms. Burke capable of earning at least $30,326.40 per year (60% of pre-disability earnings) in a sedentary, light-duty job given her education (college degree in Political Science) and work experience.

## B. Procedural history

Burke commenced this action on October 22, 2004. In it, she challenges the Committee's decision under ERISA § 502(a)(1)(B) and (3). Both parties filed motions for summary judgment. Burke sought to admit certain documents that were part of her 2001 claim, to which the Plan objected on the ground that they were not part of the administrative record. The district court granted the Plan's motion for summary judgment and denied Burke's motion, sustaining the Plan's evidentiary objection.[9]

First, the district court held that the disputed evidence was not part of the administrative record because there was "no evidence in the record that the documents at issue were before the Committee at the time of its decision," and "plaintiff

---

[9]Earlier, the district court had ruled that the Committee's decision would be reviewed under an abuse of discretion standard.

never submitted the documents at issue . . . for her current claim." As a result, it did not consider the evidence at issue.

Second, the district court concluded that the Committee did not act arbitrarily in relying on Dr. Barry's evaluation in finding that Burke was not "Totally Disabled." The district court also concluded that the Committee's decision had "a reasonable factual basis," and "given the highly deferential standard of review in this case," it concluded "that the Committee's decision that plaintiff was not 'totally incapacitated' and could enter the workforce has a reasonable factual basis and was within its discretionary authority." The district court further concluded, however, that "the Committee's determination with respect to the level of earnings that plaintiff would be able to procure is an abuse of discretion as it appears to be based on mere conjecture rather than on a reasonable fact-finding process," because it considered no vocational evidence.

Finally, the district court granted the Plan's motion for summary judgment because of Burke's refusal to attend the scheduled, second IME, holding that the refusal provided "an independent basis for the denial." The district court declined to consider the other procedural grounds for termination of benefits found by the Committee.

Burke filed a timely notice of appeal.

## II.

## STANDARD OF REVIEW

The Supreme Court has held that a denial of benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("*Firestone Tire*"). When a plan unambigu-

ously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc). The Plan here unambiguously grants the Committee the discretion to construe the Plan's terms. As a result, an abuse of discretion standard is appropriate.

As noted, the Plan is administered by the Committee and funded by the Trust, which, in turn, is funded by contributions from Pitney and Pitney's employees. The district court considered whether, based on this structure, the Plan operated under a conflict of interest. Relying on *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1322-23 (9th Cir. 1995), the district court held that there was no conflict of interest because Burke failed to produce evidence "that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations." (Quoting *Atwood*, 45 F.3d at 1323.)[10]

[1] Subsequent to the district court's decision, however, this circuit, sitting en banc, overruled *Atwood* and created a new framework for applying the abuse of discretion standard, which was, of course, not applied by the district court. *See Abatie*, 458 F.3d at 965-69 (overruling *Atwood*, and holding that a structural conflict of interest exists when an administrator acts as both the funding source and administrator of the plan that must be taken into account as a factor in determining whether an abuse of discretion occurred).

---

[10]Under *Atwood*, "a structural conflict of interest did not necessarily alter the standard of review." *Abatie*, 458 F.3d at 966. The plan participant was instead required to present " 'material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary.' " *Id.* (quoting *Atwood*, 45 F.3d at 1323). Upon such a showing, the burden "shifted to the administrator to prove that the conflict of interest did not affect its decision to deny benefits." *Id.* Only if the administrator failed to carry this burden did the standard of review change to *de novo*. *Id.*

Even more recently, the Supreme Court set forth a framework, similar to the one provided in *Abatie*, in considering whether the dual role of administering and funding an ERISA plan creates a conflict of interest, and if so, how that conflict should be considered in evaluating whether a plan administrator has abused its discretion. *Metropolitan Life Ins. Co. v. Glenn*, ___ U.S. ___, 128 S.Ct. 2343, 2346 (2008) ("*MetLife*"). The Court noted that "[i]n 'determining the appropriate standard of review,' a court should be 'guided by principles of trust law' " and that "[i]f 'a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest,* that conflict must be *weighed as a 'factor* in determining whether there is an abuse of discretion.' " *Id.* at 2347-48 (emphases in the original) (citing *Firestone Tire,* 489 U.S. at 115).

The Court further stated:

> [The answer is clear that there is a conflict of interest] where it is the employer that both funds the plan and evaluates the claims. In such a circumstance, "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket." The employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary. Thus, the employer has an "interest . . . conflicting with that of the beneficiaries," the type of conflict that judges must take into account when they review the discretionary acts of a trustee of a common-law trust.

*Id.* at 2348 (quoting *Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 144 (3rd Cir. 1987) (*"Bruch"*); Restatement § 187, Comment *d*). The ERISA LTD plan at issue in *MetLife*, however, was an insurer administrated and funded plan. *Id.* at 2346. The Court stated that the structural conflict "is less clear where . . . the plan administrator is not the employer

itself but rather a professional insurance company," but none-
theless concluded that a conflict does exist in those circum-
stances. *Id.* at 2349-50.

Having concluded that a conflict of interest existed where
an insurer both funded and administered an ERISA LTD plan,
the Court then discussed how that conflict should be consid-
ered in evaluating the insurer's exercise of its discretion. The
Court noted that the abuse of discretion standard of review
still applied despite the structural conflict of interest. *Id.* The
reviewing court, however, must:

> take account of the conflict when determining
> whether the trustee, substantively or procedurally,
> has abused his discretion. . . . [C]onflicts are but one
> factor among many that a reviewing judge must take
> into account. . . . [T]he word 'factor' implies,
> namely, that when judges review the lawfulness of
> benefit denials, they will often take account of sev-
> eral different considerations of which a conflict of
> interest is one. . . . In such instances, any one factor
> will act as a tiebreaker when the other factors are
> closely balanced, the degree of closeness necessary
> depending upon the tiebreaking factor's inherent or
> case-specific importance. The conflict of interest at
> issue here, for example, should prove more impor-
> tant (perhaps of great importance) where circum-
> stances suggest a higher likelihood that it affected
> the benefits decision, including, but not limited to,
> cases where an insurance company administrator has
> a history of biased claims administration. It should
> prove less important (perhaps to the vanishing point)
> where the administrator has taken active steps to
> reduce potential bias and to promote accuracy, for
> example, by walling off claims administrators from
> those interested in firm finances, or by imposing
> management checks that penalize inaccurate deci-

sionmaking irrespective of whom the inaccuracy benefits.

*Id.* at 2350-51 (internal citations omitted).

## III.

## DISCUSSION

### A.   Consideration of the Plan in light of *MetLife*

**[2]** Because the district court applied the now overruled *Atwood* framework for evaluating structural conflicts of interest, and did not consider the Plan in light of *MetLife* and *Abatie*, we must remand this case for further proceedings. In remanding, we note that the Plan at issue here is unlike the plan at issue in *MetLife* for a number of reasons that may be significant to the district court's analysis.

**[3]** First, and most significantly, the Plan's structural conflict is mitigated by the fact that benefits paid by Pitney's Plan are paid out of the Plan's Trust; they are not paid directly by Pitney, so that there is no *direct* financial impact on Pitney resulting from the distribution of benefits.[11] There is some pre-*MetLife* support for the proposition that there is no conflict of interest when plan benefits are paid out of a trust. *See, e.g., Post v. Hartford Ins. Co.*, 501 F.3d 154, 164 n.6 (3d Cir. 2007) (stating that "when the employer both funds and administers the plan, but pays benefits out of a fully funded and segregated ERISA trust fund rather than its operating budget, no structural conflict of interest is created"); *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 856 (11th Cir. 2007) (stating that "no conflict of interest exists where benefits are paid from a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying bene-

---

[11]In addition, as a VEBA trust fund, money once paid into the Trust cannot revert back to Pitney.

fits"); *Vitale v. Latrobe Area Hosp.*, 420 F.3d 278, 282-83 (3rd Cir. 2005) (holding that a heightened version of abuse of discretion standard was not applicable because plan benefits were paid out of a separate trust fund); *de Nobel v. Vitro Corp.* 885 F.2d 1180, 1191-92 (4th Cir. 1989) (holding that there was no conflict of interest from an employer-funded plan where plan funds were held in a trust because there is no direct and immediate expense to the employer from the pay-out of benefits).

**[4]** In light of *MetLife*, however, we disagree with those cases and hold that even when a plan's benefits are paid out of a trust, a structural conflict of interest exists that must be considered as a factor in determining whether there was an abuse of discretion. We reach this conclusion because, even though benefits are not paid directly by Pitney, Pitney obviously still has a financial incentive to keep claims' experience under the Plan as low as possible — the less the Trust pays out as benefits, the less Pitney will ultimately need to contribute to the Trust to maintain its solvency. Thus, although the impact may be less direct, there is nonetheless a close relationship between benefits paid by the Trust and the money Pitney must provide from its general assets to fund the Trust.

In discussing plans administered and funded directly by employers, the Supreme Court stated that " 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.' The employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *MetLife*, 128 S.Ct. at 2348 (quoting *Bruch*, 828 F.2d at 144). Similarly, even when benefits are paid out of a trust, instead of directly by an employer, the employer has a financial incentive to deny claims because every dollar not paid in benefits is a dollar that will not need to be contributed to fund the Trust. Although this impact is indirect, and therefore a less significant conflict compared to plans with benefits paid directly by employers, a structural

conflict of interest does exist. Thus, the structural conflict of interest must be considered as a factor in evaluating whether the Plan abused its discretion in terminating Burke's benefits. *See Abatie*, 458 F.3d at 968 (recognizing that structural conflicts of interest come in a variety of forms that should be weighed accordingly, and stating that "[a]n egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might. But in any given case, all the facts and circumstances must be considered").

**[5]** Second, the fact that Pitney's employees make some contribution to the Trust tends to lessen the structural conflict of interest. Thus, to maintain the Trust's solvency, Pitney is only required to pay a portion of the benefits actually paid out by the Trust, as the remaining funds come from employee contributions. This fact mitigates the structural conflict of interest. It does not, however, eliminate the conflict because although there is not a dollar-for-dollar correlation, it still remains true that the more that the Trust pays out in benefits, the more Pitney must contribute to maintain the Trust's solvency.

**[6]** Third, unlike the plan at issue in *MetLife*, Pitney's Plan is an employer administered and funded plan.[12] The Supreme Court indicated that it viewed employer funded and administered plans as creating a greater structural conflict than an insurer administered and funded plan.[13] *MetLife*, 128 S.Ct. at

---

[12]We must obviously leave for another day the effect of a plan that is jointly-administered by the employer and employee representatives. *See* footnote 1, *supra*.

[13]Although the Supreme Court noted that plans funded and administered by employers more clearly create a conflict of interest, the Court stated that despite this difference, "a legal rule that treats insurance company administrators and employers alike in respect to the *existence* of a conflict can nonetheless take account of the [differences between dual-role insurers and employers] so far as it treats those, or similar, circumstances as diminishing the *significance* or *severity* of the conflict in individual cases." *MetLife*, 128 S.Ct. at 2350 (emphases in the original).

2348-50; *but see, e.g., Vitale*, 420 F.3d at 282 (stating that "employer fiduciaries have 'incentives to avoid the loss of morale and higher wage demands that could result from the denial of benefits;' these incentives are absent, or at least attenuated, when an insurer serves as an ERISA fiduciary") (quotation source omitted); *Smathers v. Multi-Tool, Inc.*, 298 F.3d 191, 197-98 (3rd Cir. 2002) (stating "we have explained that the risk of a conflict of interest is decreased where the administrator and funder of the plan is the employer, rather than an insurance company, because the employer has 'incentives to avoid the loss of morale and higher wage demands that could result from denials of benefits' suggesting that there is at least some counter to the incentive not to pay claims," though recognizing that this conflict-mitigating factor is lessened when the claimant is no longer an employee) (quotation source omitted). Because the Plan is administered by Pitney, rather than an insurer, this aspect of the Plan tends to increase the Plan's structural conflict of interest in comparison to the plan at issue in *MetLife*, 128 S.Ct. at 2348-50.

**[7]** Based on the above considerations, although there are aspects of the Plan that cut both ways, the Plan creates less of a structural conflict of interest than the structural conflict of interest that exists with the typical dual-role plan. That said, a structural conflict of interest does exist and, as a result, it must be "consider[ed] . . . as a factor in determining whether [the Plan] has abused its discretion in denying [Burke's LTD claim]." *MetLife*, 128 S.Ct. at 2346. Because the district court did not consider the Plan's structural conflict of interest as a factor in making its decision, we vacate the district court's ruling and remand for further proceedings consistent with this opinion.[14]

---

[14]We also do not decide on this appeal whether it was an abuse of discretion for the Committee, alternatively, to base its decision on the procedural ground that Burke refused to attend the second IME. In reviewing this, and any other procedural issue, anew under the *MetLife/Abatie* standard, the district court should address whether the Plan was prejudiced by

## B.   Evidentiary ruling

**[8]** We also vacate the district court's ruling that it could not consider the supplemental evidence submitted by Burke because it was not part of the administrative record, in light of our remand of the case on the merits. It is the general rule, of course, that when applying an abuse of discretion standard to an ERISA plan, the district court's review is limited to the administrative record. *Abatie*, 458 F.3d at 970. But in excluding the disputed evidence, while observing that there was "no evidence in the record that the documents at issue were before the Committee at the time of its decision," and that "plaintiff never submitted the documents at issue," the district court failed to consider the peculiar circumstances of this case.

When Burke asked the Plan to provide her with copies of all of the relevant records, the Plan noted that it was not sending her copies of any documents "submitted, considered or generated" in connection with her earlier claim and settlement because it "assume[d] you retained copies" of those documents. Later, the Plan stated to Burke in connection with another request for documents that "the majority of those documents *are already a part of Ms. Burke's file* (submitted by Ms. Burke prior to the September 26, 2002 Settlement Agreement)." (Emphasis added.) Given this correspondence about Burke's file, it is understandable that Burke assumed that her earlier papers were a part of her current file, and Burke may have been lulled into such a mistaken belief by the Plan's representations, an issue the district court should consider when it reconsiders its evidentiary ruling.

_____

the procedural default or, absent such prejudice, whether it would be an abuse of discretion to deny benefits for such a harmless error.

Likewise, given our remand, we have no occasion to review the district court's ruling as to Burke's post-injury level-of-earnings capacity, which is not directly challenged on this appeal.

Further, even if this evidence is not part of the administrative record, the district court may "consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest. . . ." *Abatie*, 458 F.3d at 970. Here, for example, the Committee asserts that Burke is ineligible for benefits because she did not file a timely claim, but the excluded evidence indicates that Burke may have made a timely request for an LTD benefits claim form and was told that she was not eligible. The district court may consider this evidence to the extent it is relevant in determining whether the structural conflict of interest influenced the Committee's decision to terminate Burke's benefits.[15]

[9] Similarly, the district court may consider evidence outside the administrative record if it determines that procedural irregularities prevented the full development of the administrative record. *See id.* at 973 (stating that "the court may take additional evidence when the [procedural] irregularities have prevented full development of the administrative record"). Here, for example, there is some evidence of procedural irregularities, as the Committee considered a basis for terminating her benefits on appeal that was not part of the Plan's initial decision to terminate her benefits — specifically, the timeliness of her claim. As a result, Burke had no reason to submit evidence into the administrative record regarding the timeliness of her claim, as she was not made aware that the Committee was considering that as a basis for terminating her benefits on appeal. Thus, to the extent there was a procedural irregularity by the Plan in considering a basis for terminating Burke's benefits on appeal without any notice to Burke of that basis, the district court can consider evidence outside the administrative record that is absent from that record due to the procedural irregularity. *See id.*

---

[15]Whether to permit discovery into the nature, extent, and effect of the Plan's structural conflict of interest is also a matter within the district court's discretion.

## IV.

## CONCLUSION

For the foregoing reasons, we vacate the district court's grant of summary judgment and remand for reconsideration of whether the Plan's termination of Burke's LTD benefits constituted an abuse of discretion under the newly-established *MetLife/Abatie* standard, as well as the associated procedural issues.

The parties shall bear their own costs on appeal.

**VACATED and REMANDED.**