Polly WEBB, Plaintiff,

v.

THE HARTFORD FINANCIAL SER-
VICES GROUP, INC.; a Delaware
corporation; Continental Casualty
Company, an Illinois corporation; La-
tham & Watkins Group Disability In-
come Insurance Plan; and Does 1 to
10, inclusive, Defendants.

No. 2:07–cv–02000–FMC–MANx.

United States District Court,
C.D. California,
Western Division.

March 3, 2009.

Daniel W. Maguire, Edith Sanchez Shea, Burke, Williams & Sorensen, LLP, Los Angeles, CA, for Defendants, Hartford Life and Accident Insurance Company, Continental Casualty Company, and Latham & Watkins Group Disability Income Insurance Plan.

## JUDGMENT

FLORENCE–MARIE COOPER, District Judge.

Following review of all of the arguments and issues raised by the parties in the documents submitted to this Court, including the administrative record in this ERISA action, the Court finds that the decision on Plaintiff's claim for benefits did not constitute an abuse of discretion and that Plaintiff Polly Webb is not entitled to benefits under the ERISA plan.

Accordingly, judgment is hereby entered in favor of Defendants.

## ORDER ON ADMINISTRATIVE REVIEW

The matter is before the Court on Administrative review. The Court has reviewed the parties' briefs and the administrative record. As explained herein, the Court reviews the administrative decision for an abuse of discretion and concludes that plaintiff Polly Webb is not entitled to benefits under the plan and affirms the findings of Defendants.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2004, Plaintiff Polly Webb, ("Plaintiff" or "Webb") was employed by Latham & Watkins, LLP ("Latham") as a full-time legal secretary. Administrative Record ("AR") at 204–06. At that time Webb was a participant in a long-term disability ("LTD") plan ("Plan"), which Latham established and funded though the purchase of a group disability insurance policy issued by Continental Casualty Company

("CNA"). Defendant Hartford Life and Accident Insurance Company ("Hartford") purchased the Plan from CNA[1]. AR at 213–252.

Under the Plan, "disability" is defined, as follows:

> *Disability* means that during the *Elimination Period* and the following 24 months, *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1) continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation;* and
>
> 2) not working for wages in any occupation for which *You* are or become qualified by education, training or experience.
>
> After the *Monthly Benefit* has been payable for 24 months, *Disability* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1) continuously unable to engage in any occupation for which *You* are or become qualified by education, training or experience; and
>
> 2) not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

A.R. at 219. The Plan further defines "Regular Occupation" as "the occupation that *You* are performing for income or wages on *Your Date of Disability.* It is not limited the specific position *You* held with *Your* Employer." A.R. at 234.

The Plan grants the plan administrator discretionary authority to determine a participant's eligibility for benefits and to interpret the terms and provisions of the Plan.[2]

Webb has suffered from migraine headaches, of varying intensity, since the age of eight. A.R. at 123. The most severe migraine headaches were accompanied by intense pain, nausea, and vomiting, and sensitivity to light, sounds, and smells. The symptoms of migraine headaches would prevent her from performing her job duties; however, on days when she was symptom free she could fully perform her job.

As a result of Webb's migraine headaches, her last day of work at Latham was March 23, 2004. A.R. at 204. The migraine headaches were causing Webb to miss up to two weeks or more of work each month. Webb has not been employed since. At that time, Webb was under the care of Mihoko Nelsen, M.D., a neurologist, who treated her from December 2000 to March 2004, and Ms. Christine Smith, a chiropractor, who treated her for headaches, neck pain, and lower back pain. A.R. at 168–69, 177.

On August 10, 2004, Webb submitted a claim for LTD benefits to Hartford. A.R. at 203–11. Webb's claim for benefits was supported by a Physician's Statement from her treating neurologist, David Kudrow, M.D., to whom she was referred by Dr. Nelsen in March of 2004. A.R. at 168–69, 209. Dr. Kudrow wrote that the symptoms surrounding Webb's migraine head-

---

1. Defendants The Hartford Financial Services Group, Inc., Continental Casualty Company, and Latham & Watkins Group Disability Income Insurance Plan are referred to collectively as "Defendants" or "Hartford".

2. The Plan provides:

 The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to [CNA] to determine Your eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it.
 A.R. at 238.

aches, such as nausea, vomiting, photophobia, and sonophobia, first appeared "many years ago." A.R. at 209. Consequently, Webb's disability affected her ability to concentrate and read and her attention span. A.R. at 210. Dr. Kudrow planned to treat her with preventive and symptomatic medications and expected her to return to work by September 26, 2004, two months later. A.R. at 210.

Upon receipt of Webb's claim for LTD benefits, Hartford had Webb's medical records, including notes from Dr. Nelsen, Dr. Kudrow, and Ms. Smith, reviewed by Michael Martin, M.D., a Board-certified family physician. A.R. at 114–16. During the course of his review, Dr. Martin attempted to speak with Dr. Kudrow about his treatment of Webb, but the three messages he left for Dr. Kudrow were not returned. Dr. Mattin noted six chief findings: (1) under Dr. Kudrow's care, Webb experienced a decreased number of severe migraine headaches as a result of changes in her medications; (2) during Webb's September 2, 2004 visit with Dr. Kudrow, a Magnetic Resonance Imagining ("MRI") scan was performed and the results of the scan were reported as normal; (3) during a September 24, 2004 interview, Webb described a relatively unrestricted life when she does not have a migraine headache; (4) Webb's statement was supported by Dr. Kudrow, who on a September 24, 2004 functional assessment tool stated that Webb could perform all job duties when she does not have a migraine headache; (5) on a September 30, 2004 chiropractic evaluation, Ms. Smith wrote that there were days when Webb could perform her job duties; and (6) by Webb's October 12, 2004 visit with Dr. Kudrow, Webb reported no severe migraine headaches in the preceding month. A.R. at 115.

Dr. Mattin concluded that Webb had the capacity to do full-time work and there was no documentation to support the need for any restrictions or limitations. A.R. at 116. Specifically, Dr. Mattin wrote that Webb would have occasional work absenteeism as a result of migraine headaches, but the migraine headaches would not constitute a long-term impairment from working. A.R. at 116. Dr. Mattin supported his conclusion with the fact that Webb had gone a month without a severe headache. Further, her headaches did not appear to be a result of overuse of pain medication, because Dr. Mattin found that Webb was not taking a significant amount of narcotics or other pain medications. A.R. at 116.

Dr. Nelsen, who was treating Webb when she claimed total disability and stopped working at Latham, completed a functional assessment tool on September 24, 2004. A.R. at 121. Dr. Nelsen confirmed that Webb was "capable of performing full time working which is sitting at a desk for the majority of an eight hour day, heavy typing duties, high volume telephone work, preparing documents, opening, sorting and processing mail." A.R. at 121.

On November 22, 2004, based on Dr. Mattin's review, Hartford sent Webb a letter denying her claim for LTD benefits. A.R. at 67–69. In the letter, Hartford acknowledged that Webb has a medical condition resulting in migraine headaches; however, Hartford found that "the medical information provided for review does not support a change of function that is supportive of a continuous 'no work' restriction that precludes [Webb] from performing the material and substantial duties of a Legal Secretary." A.R. at 68. Consequently, Hartford denied Webb's claim because she did "not meet the definition of Disability as stated under the Long–Term Disability policy." A.R. at 67.

On February 15, 2005, Webb appealed Hartford's denial of her claim for LTD benefits. A.R. at 113. While agreeing

with Hartford's conclusion that she was fully functional on days she did not experience a migraine headache, Webb disputed Hartford's characterization of the number of days a month she experienced migraine headaches. A.R. at 113. Webb also challenged Hartford's representation that she had "gone a month without a headache." A.R. at 31, 113. Webb asserted that she continues to suffer from the effects of migraine headaches between twelve and twenty days a month. A.R. at 113. Further, two weeks prior to her appeal, Webb claimed she went to an emergency room for a severe migraine headache that lasted for five days. A.R. at 113.

Upon receiving the appeal, Hartford reviewed Webb's claim for LTD benefits for a second time. As part of the appeals process Hartford engaged Randall King, M.D., an independent Board-certified neurologist, to review Webb's file. A.R. at 93–108.

In addition to reviewing Webb's medical records, Dr. King spoke with Dr. Kudrow. Through their conversation, Dr. Kudrow stated that he diagnosed Webb with "chronic daily headache or medication overuse headache/rebound-type headaches." A.R. at 99. He was concerned that she was experiencing rebound headaches because of the amount of analgesics she was taking. A.R. at 99. Over the course of her treatment with Dr. Kudrow, the number of severe migraine headaches she experienced decreased and she had more headache-free days. A.R. at 100. Dr. Kudrow attempted to withdraw her from all analgesics and had not been successful. A.R. at 99. As a result Dr. Kudrow referred Webb to another physician because he "did not feel that there was much more [he] could do." A.R. at 99. Dr. Kudrow did not comment directly on Webb's disability status, but stated that while Webb claimed to be severely disabled he had patients "with much more

severe headaches than Ms. Webb who continue to work." A.R. at 99.

Dr. King completed his review and wrote a report that summarized Webb's medical history. A.R. at 93–98. Dr. King's report agreed with Dr. Kudrow's diagnoses and concluded that Webb suffered from "chronic daily headache of the medication overuse headache variant." A.R. at 96. Further, while under treatment by Dr. Kudrow, Webb barely met the criteria of fifteen headaches per month and was most likely among the lower ten to twenty percent for severity and frequency of headaches. A.R. at 96.

Based on Dr. King's review and findings, on March 23, 2005, Hartford wrote Webb a letter and informed her that her claim, and all associated evidence, had been independently reviewed, Hartford's original conclusion did not change, and the original decision to deny her claim for LTD benefits was correct. A.R. at 90–91. Hartford stated that the fact that Webb "may miss time from work on occasion related to [her] medical condition does not reflect a continuous period of 'Disability' as defined in the terms of the [Plan]." A.R. at 91.

## II. ERISA PLANS

This action arises out of a dispute over entitlement to benefits under a policy of insurance governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"). ERISA regulates certain employee benefit plans, including employee welfare benefits plans such as the long-term disability plan at issue in this action. 29 U.S.C. §§ 1002(1), (3); 1003(a). The instrument must provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan. *Id.*

■ Beneficiaries who seek benefits due under an ERISA plan must first seek relief with the plan administrator. *Chappel v. Laboratory Corp. of America*, 232 F.3d 719, 724 (9th Cir.2000). After the beneficiary has exhausted this remedy, he or she may file a civil action. 29 U.S.C. § 1132(a)(1)(B).

### III. STANDARD OF REVIEW

■ The Supreme Court has held that a denial of benefits "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). "When a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable." *Burke v. Pitney Bowes, Inc. Long–Term Disability Plan*, 544 F.3d 1016, 1023–24 (9th Cir.2008)(citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006)(en banc)).

In *Metropolitan Life Ins. Co. v. Glenn*, — U.S. —, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008), the Supreme Court set forth a framework, similar to the one provided in *Abatie*, to assess whether the dual role of administering and funding an ERISA plan creates a conflict of interest, and if so, how that conflict should be considered in evaluating whether a plan administrator has abused its discretion. The Court reiterated the principles established in *Firestone Tire*, and noted, "[i]n 'determining the appropriate standard of review,' a court should be 'guided by principles of trust law,'" and "[i]f 'a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest*, that conflict must be *weighed as a factor* in determining whether there is an abuse of discretion.'" *Metropolitan Life Ins.*, 128 S.Ct. at 2347–48 (alternation in original) (quoting *Firestone Tire*, 489 U.S. at 115, 109 S.Ct. 948).

■ A conflict of interest is clearly present "where it is the employer that both funds the plan and evaluates the claims." *Id.* at 2348. The Court noted that abuse of discretion standard of review still applied despite the structural conflict of interest. *Id.* at 2349–50. However, after concluding a conflict of interest exists, a reviewing court must:

> take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion.... [C]onflicts are but one factor among many that a reviewing judge must take into account.... The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Burke*, 544 F.3d at 1025 (quoting *Metropolitan Life Ins.*, 128 S.Ct. at 2350–51). In other words, a structural conflict of interest and the circumstances surrounding the conflict are weighed and taken into account to determine whether the plan administrator has abused its discretion.

■ In general, a district court may review only the administrative record

when considering whether the plan administrator abused its discretion. *Abatie*, 458 F.3d at 970. The administrative record generally consists of the record that was before the administrator when the decision was made. *Tremain v. Bell Industries, Inc.*, 196 F.3d 970, 976–77 (9th Cir.1999). "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* (citing *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1st Cir.1999)).

## IV. DISCUSSION

### A. Abuse of Discretion Standard

Through their respective pleadings, the parties agree that this action is to be reviewed for an abuse of discretion. *See* Pl. Polly Webb's Opening ERISA Trial Br. at 15:5–7; Def.'s Opening ERISA Trial Br. at 8:3–4. It is clear and unambiguous that the Plan in this case grants Hartford the discretion to determine eligibility for benefits and to construe the terms of the Plan:

> The plan administrator and other plan fiduciaries have discretionary authority to determine Your eligibility for and entitlement to benefits under the Policy. The plan administrator has delegated sole discretionary authority to [CNA] to determine Your eligibility for benefits and to interpret the terms and provisions of the plan and any policy issued in connection with it.

A.R. at 238; *see also Firestone*, 489 U.S. at 115, 109 S.Ct. 948. A presumption therefore arises that an abuse of discretion standard of review is appropriate. *See Burke*, 544 F.3d at 1023–24.

■ "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir.2005); *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (9th Cir.1999). The burden is on plaintiff to prove that the plan administrator's interpretation "was arbitrary and capricious." *St. Mary Medical Center v. Cristiano*, 724 F.Supp. 732, 742 (C.D.Cal.1989).

### B. Structural Conflict of Interest

■ The facts of this case demonstrate that Hartford was both the plan administrator and the funding source of the Plan. Hartford created a structural conflict of interest.

The Supreme Court recently observed that the "answer is clear where it is the employer that both funds the plan and evaluates the claims":

> In such a circumstance, 'every dollar provided in benefits is a dollar spent by ... the employer; and every dollar saved ... is a dollar in [the employer's] pocket.' The employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsel to the contrary. Thus, the employer has an 'interest ... conflicting with that of the beneficiaries,' the type of conflict that judges must take into account when they review the discretionary acts of a trustee of a common-law trust.

*Metropolitan Life Ins. Co.*, 128 S.Ct. at 2348 (internal citations omitted).

The Supreme Court acknowledged that the conflict of interest question is "less clear" when a plan administrator is an insurance company instead of an employer. The Supreme Court found, however, that an insurance company is subject to the

same conflict of interest analysis because there is an incentive for an insurance company to fail to administers the plan fairly. *Id.* at 2350. An employer may select an insurance company to manage its plan that has low rates rather than one with accurate claims processing. *Id.* Moreover, ERISA "imposes higher-than-marketplace quality standards on insurers":

> It sets forth a special standard of care upon a plan administrator, namely, that the administrator discharge [its] duties in respect to discretionary claims processing solely in the interests of the participants and beneficiaries of the plan ... [I]t simultaneously underscores the particular importance of accurate claims processing by insisting that administrators provide a full and fair review of claim denials."

*Id.* (internal quotations and citations omitted).

Plaintiff argues that the analysis of the conflict of interest must be considered by the Court, and that the significance of the conflict will depend upon the circumstances of the case and may serve as a tiebreaker when the other factors are closely balanced. Pl. Polly Webb's Opening ERISA Trial Br. at 16:14–23. As a consequence, Plaintiff concludes that the facts of this case are such that Hartford's structural conflict of interest is a significant factor in determining whether Hartford abused its discretion.

Defendants concede that a structural conflict of interest exists as a result of its dual roles; however, Hartford argues that the conflict is not significant because Hartford is an insurance company rather than an employer. Def.'s Opening ERISA Trial Br. at 8:23–28. Defendants allege that as an insurance company they face many regulatory and market constraints that will serve to punish an insurance company when its products fall below par. *Id.*

The Court appreciates the structural conflict of interest present in this case. While Hartford is an insurance company and not an employer, the fact remains that it was both making the benefit determination and funding the plan, and "for ERISA purposes a conflict exists." *Metropolitan Life Ins. Co.,* 128 S.Ct. at 2349. For the reasons discussed below, even with the existence of the structural conflict of interest, Hartford did not abuse it discretion when denying Plaintiffs claim for LTD benefits.

## C. Hartford Did Not Abuse Its Discretion

■ Plaintiff has failed to satisfy her burden that Hartford abused its discretion when reviewing her claim for LTD benefits. Plaintiff argues that Hartford abused its discretion both: (1) by misconstruing the plain language of the Plan; and (2) by relying on clearly erroneous findings of fact. Plaintiff does not claim that Hartford rendered a decision without explanation. For the reasons stated below Plaintiff's arguments are not well taken.

### 1. Hartford did not misconstrue the plain language of the Plan

Under the terms of the Plan an insured is entitled to LTD benefits if during the first twenty-four months of the claimed disability the insured is "continuously unable to perform the *Material and Substantial Duties* of [His or Her] *Regular Occupation*" and "not working for wages in any occupation for which [He or She is] or become[s] qualified by education, training or experience." A.R. at 219. The Plan defines "Regular Occupation" as "the occupation that [He or She is] performing for income or wages on [His or Her] *Date of Disability*. It is not limited to the specific position [He or She] held with [His or Her] Employer." A.R. at 234.

Both Plaintiff and Hartford agree that the case centers on whether Plaintiff meets the Plan's definition of "total disability." In other words, whether Plaintiff's migraines rendered her "continuously unable to perform" her duties as a legal secretary.

Webb argues that Hartford misconstrued the plain language of the Plan by failing to take into consideration that her occupation was a "*full time* legal secretary." Webb claims that the she averages twelve to twenty days per month of headaches sufficiently severe to prevent her from performing her job duties and which would cause her to miss between five to fifteen days of work each month. While she could perform her job duties on days she experienced no symptoms of a migraine headache, her migraine headaches occurred with sufficient frequency to prevent her from working at least thirty-seven and a half hours each week to maintain her status as a full time legal secretary. If she worked fewer than thirty hours a week she would become ineligible for LTD benefits under the Plan. Pl. Polly Webb's Opening ERISA Trial Br. at 20:1–4. Thus, "her medical condition renders her continuously unable to perform her material and substantial job duties *on a full time basis*" Pl. Polly Webb's Opening ERISA Trial Br. at 20:20–21.

Hartford argues that Webb's periodic headaches did not totally disable her from her occupation. Hartford based its conclusion on the findings of two independent physicians who reviewed Webb's claim and medical records. They noted that her MRI was normal and opined that the records did not reflect that Webb's headaches were frequent or severe enough to prevent full time work.[3] Further, Webb's own treating physician, Dr. Nelsen, opined that

Webb was "capable of performing full time work...." AR at 121.

The evidence does not support the contention that Hartford did not take into consideration that Plaintiff's occupation was a *full time* legal secretary in concluding that she was not continuously disabled. Although the record is not clear about the severity and frequency of Plaintiff's headaches, Hartford reasonably concluded, based on the physicians' reports, that Plaintiff's headaches did not render her totally disabled.

Plaintiff contends that Hartford concluded that Plaintiff was not continuously disabled "because there were days when Webb could perform her job duties." Pl. Polly Webb's Opening ERISA Trial Br. at 19:26–27. In its denial letter dated March 23, 2005, Hartford recognized that Plaintiff "may miss time from work on occasion." This acknowledgment that Webb's condition at times renders her unable to perform her job duties supports Hartford's finding that Plaintiff was able to perform her duties the majority of the time, thereby not rendering her continuously disabled.

The Court recognizes than an employer could not tolerate inconsistent attendance and unpredictability from a full time employee whose absenteeism averaged two or more lost days each week. However, based on its investigation, Hartford did not find that Plaintiff was unable to work two or more days a week. Rather, it found that Plaintiff's headaches were periodic and did not preclude her from performing her job duties on a full time basis. Therefore, Hartford did not abuse its discretion in arriving at its conclusion that Plaintiff was not totally disabled within the meaning of the Plan.

---

**3.** Dr. Martin stated in his November 11, 2004 medical report, "There is no documentation that Ms. Webb currently has headaches with severe enough frequency duration or intensity to preclude *full time* work." AR at 116 (emphasis added).

## 2. Hartford did not rely on clearly erroneous findings of fact

As a second, independent ground to find that Hartford abused its discretion, Plaintiff argues that Hartford based its denial on several clearly erroneous findings of fact borne from a rejection of the conclusions of Webb's treating physicians.

Plaintiff identifies three ways in which Hartford improperly dispensed with the opinions of Dr. Kudrow and Ms. Smith, both of whom stated that Webb could not perform her job duties on a full time basis. First, Plaintiff argues Dr. Mattin, who initially reviewed her file, is a family practitioner and does not possess the qualifications to render an opinion regarding the nature of migraine headaches. Second, Plaintiff argues that Dr. King, who reviewed Webb's file on appeal, based his opinion on Dr. Kudrow's diagnostically meaningless comments comparing Webb's condition to other patients and created a new medical diagnosis that is not reflected in any of Webb's medical records. Third, Dr. King and Dr. Mattin reached different medical conclusions, and Hartford did not reconcile the contradictory opinions.

Hartford argues that Webb's medical records did not support a finding that the severity or frequency of her headaches would totally disable her from working as a legal secretary. Defendants support their conclusion by stating that Webb was not taking a significant amount of medication, and at the time she stopped working she was only taking two Darvocet per day. Def.'s Opening ERISA Trial Br. at 10:12–16 (citing A.R. at 116, 168). Further, Defendants claim that Webb experienced migraine headaches for years and her records did not show a change in her condition.

 Hartford conducted a thorough investigation into Webb's claim for LTD benefits prior to issuing a denial. It is not uncommon in an ERISA action that there are conflicting reports from a plaintiff's treating physicians and the Plan's reviewing physicians. *See Jordan v. Northrop Grumman Corp. Welfare Benefit Plan,* 370 F.3d 869, 880 (9th Cir.2003). Because reasonable people can disagree on whether a plaintiff was disabled for the purposes of an ERISA plan, the administrator of a plan cannot be characterized as acting arbitrarily for disagreeing with a plaintiff. *Id.* "It is not for an appellate court to decide that [a medical condition] should be treated by ERISA plan administrators as disabling in a particular case. That is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence." *Id.*

Hartford did not rely on clearly erroneous findings of facts when denying Webb's claim for LTD benefits. Hartford concluded that while Webb suffered from migraine headaches, the migraine headaches were not so severe or numerous to be considered a long-term disability. Hartford reviewed Webb's claim on two different occasions and engaged the services of an independent Board-certified family physician and an independent Board-certified neurologist.

First, Dr. Mattin, a Board-certified family physician, reviewed the March 31, 2004 through October 12, 2004 entries in Webb's medical file. Included in his review were the medical notes of Dr. Kudrow, Dr. Nelsen, and Ms. Smith; functional assessment tools; and an MRI report. Based on his review, Dr. Mattin concluded that while Webb will have days when migraines will occur and have occasional work absenteeism, that would not constitute long-term impairment from working.

Second, after Webb appealed the denial of her claim, Hartford engaged a second, independent doctor to review Webb's claim

for LTD benefits. Dr. King, a Board-certified neurologist, thoroughly reviewed medical notes from Dr. Kudrow and Dr. Nelsen. Also Dr. King spoke with Dr. Kudrow and discussed Webb's condition. Dr. King sent Dr. Kudrow a letter to confirm the content of their conversation and provided Dr. Kudrow an opportunity to make any changes or additions to the letter. Dr. King wrote that Dr. Kudrow stated that he had patients that experienced more severe headaches than Webb and were capable of working, but that did not mean Webb was capable of working. Dr. Kudrow did not respond or otherwise dispute Dr. King's summary. Dr. King's medical conclusion is virtually identical to that of Dr. Kudrow, finding that Webb was suffering from medication-overuse headaches and that she was in the lower ten to twenty percent for severity and frequency of headaches. As a result, Dr. King concluded that Webb's headaches were not of such frequency or intensity that they would preclude her from working at a light or sedentary level.

Both of the doctors engaged by Hartford reviewed all of Webb's medical records, and Hartford's final decision rested on the opinion of a Board-certified neurologist. The fact that Dr. Mattin and Dr. King reached different medical conclusions is of no moment because they engaged in independent medical reviews. Further supporting Hartford's final decision, Webb's own physicians' notes belie her claim of total disability. In his August 10, 2004 medical notes, the same date that Plaintiff submitted her LTD claim, Dr. Kudrow wrote that Webb would likely be able to return to work in two months, by September 26, 2004. A.R. at 210. Further, Dr. Nelsen, who was treating Webb when she stopped working, responded on a September 24, 2004 functional assessment tool that Webb, with the diagnosis of migraine headaches, was "capable of performing full time working which is sitting at a desk for the majority of an eight hour day, heavy typing duties, high volume telephone work, preparing documents, opening, sorting and processing mail." A.R. at 121.

Accordingly, Plaintiff has failed to satisfy her burden to establish that Hartford abused its discretion by basing its denial of her LTD claim on clearly erroneous findings of fact.

## V. CONCLUSION

For the foregoing reasons the decision to terminate benefits was not an abuse of the administrator's discretion. Therefore the Court AFFIRMS Hartford's decision. Defendants are to prepare and lodge a proposed Judgment within ten days of the date of this Order.

**IT IS SO ORDERED.**