Bettie M. HARRISON, an
individual, Plaintiff,

v.

CATHOLIC HEALTHCARE WEST GROUP LONG TERM DISABILITY PLAN; Unum Life Insurance Company of America, a Maine Corporation, and Does 1 through 100, inclusive, Defendants.

No. CV 07–3544 SVW(JWJX).

United States District Court,
C.D. California.

Jan. 8, 2009.

Order Amending Opinion Jan. 28, 2009.

Bruce A. Beckman, Bruce A. Beckman Law Office, Tarzana, CA, for Plaintiff.

Edith S. Shea, Burke Williams and Sorensen, Los Angeles, CA, for Defendants.

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [64, 65] [JS–6]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

Plaintiff Bettie M. Harrison ("Plaintiff") brought this action against Defendant Unum Life Insurance Company of America ("Defendant") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff is a beneficiary of a long-term disability benefits plan that Defendant funds and administers. Plaintiff seeks to recover disability benefits for the period from May 2005, when her claim was terminated, through July 2008, when Plaintiff turned sixty-five. For the reasons that follow, the Court finds that, when applying a heightened form of discretionary review, Defendant did not abuse its discretion when it denied Plaintiff's claim for disability benefits.

## II. FACTS

Plaintiff was employed as a Human Resources Manager at the Merced, California hospital of Catholic Healthcare West. On January 1, 2002, Defendant issued a long-term disability policy number 561977003 ("Policy") to Catholic Healthcare West to fund the Healthcare West Group Long Term Disability Plan ("Plan"), under which Plaintiff was covered. (*See* Admin. Record ("AR"), at 53.) The Policy contains language explicitly delegating discretionary powers to Unum, a fact not disputed by the Plaintiff.[1] The Policy also provides

---

1. The relevant portion of the Policy states: DISCRETIONARY ACTS: In exercising its discretionary powers under the Plan, the Plan Administrator, and any designee (which shall include Unum as a claims fiduciary) will have the broadest discretion possible under ERISA and any other applicable laws, and its decisions will constitute final review of your claim by the Plan. Benefits under this Plan will be paid only if the Plan Administrator or its designee (including Unum), decides in its discretion that the applicant is entitled to them. (AR, at 87.)

that "disabilities due to mental illness, alcoholism or drug abuse have a limited pay period up to 24 months." (*Id.* at 75.)

Plaintiff became ill and ceased working on September 26, 2002, as a result of an asserted total disability. (*Id.* at 24.) Plaintiff submitted a claim for disability benefits in April 2003, which stated such symptoms as depression, memory impairment, insomnia, panic attacks, and "general anxiety disorder." (*Id.*) Plaintiff's claim was denied by letter on June 5, 2003. (*Id.* at 275.) In the letter, Defendant stated that "[b]ased on our Medical Departments [sic] review of the information on file, we have determined that you do not have a severity of symptoms that would preclude you from performing your occupation as a Human Resources Manager." (*Id.* at 276.)

On November 30, 2003, Plaintiff appealed the denial. (*Id.* at 291.) As part of the appeal, Plaintiff noted the statement of family physician Christian Gallery, M.D., which was included in Plaintiff's initial disability claim, where Dr. Gallery diagnosed Plaintiff with depression. (*Id.* at 28.) Plaintiff also included a letter from Plaintiff's treating psychiatrist, Latif Ziyar, M.D., which stated that Plaintiff suffered from general anxiety and depression. (*Id.* at 306.) Finally, the report of Tedde Rinker, M.D., was included in the appeal, which diagnosed Plaintiff with major depression, hypothyroidism, adrenal fatigue, homocistenemia, and menopausal crisis. (*Id.* at 308–09.) On December 1, 2003, Dr. Gallery submitted an additional letter in which he further described his diagnosis for general anxiety disorder and insomnia. (*Id.* at 318.)

On July 28, 2004, Defendant informed Plaintiff that Defendant had completed review of Plaintiff's appeal, and had decided to reverse its earlier denial of benefits. (*Id.* at 402.) Defendant informed Plaintiff that she had been "approved for benefits due to [her] psychiatric condition," but not for a physical disability. (*Id.* at 404.) Defendant noted that payment under the Policy for mental illness was limited to 24 months. (*Id.* at 402.)

Defendant's decision to reverse its decision on appeal, and to pay benefits, was based in part on a review conducted by psychologist Thomas M. Pendergrass, Ph.D. (*Id.* at 398.) In Dr. Pendergrass's report, he diagnosed Plaintiff with "major depressive disorder." (*Id.*) After reviewing Plaintiff's medical records, Dr. Pendergrass concluded that it was "consistent with a severe level of functional and cognitive impairment." (*Id.* at 399.) In his opinion, "with a reasonable degree of psychological certainty, the additional data provided adequate, credible support for occupation precluding functional limitations." (*Id.*) Moreover, Dr. Pendergrass found the data "consistent with an inability to work due to cognitive and behavioral symptoms." (*Id.*)

After paying benefits for the 24 months provided under the Plan, on May 31, 2005, Defendant terminated Plaintiff's benefits. (*Id.* at 555.) Defendant stated that because Plaintiff's disability resulted from mental illness, the time had run on her benefits. (*Id.*) On November 29, 2005 Plaintiff, through her lawyer Bruce Beckman, submitted an appeal. (*Id.* at 651.) In the appeal, Plaintiff argued that the reports of new doctors provided grounds for the granting of continuing benefits because they demonstrated that Plaintiff's disability arose from physical diseases, not mental illness. (*Id.* at 653.) Specifically, Plaintiff claimed that new the reports from her doctors demonstrated that she was suffering from (1) Lyme disease with coinfections of Ehrlichiosis, Babesiosis, and Bartonella Henselae; (2) hypothyroidism; (3) adrenal fatigue; and (4) diminished blood perfusion to certain areas of her brain, which Plaintiff asserted was consis-

tent with brain trauma or infection. (*Id.*) Plaintiff argued that all of her symptoms had been, since prior to 2002, caused by underlying physical diseases, and were therefore covered by the Plan. (*Id.*)

The appeal included reports from three doctors who diagnosed Plaintiff with the asserted physical diseases. First, Dr. Rinker, opined that Plaintiff suffered from hypothyroidism and adrenal fatigue/insufficiency. (*Id.* at 672–73.) Dr. Rinker is board-certified in anti-aging medicine; she received her medical degree from the College of Osteopathic Medicine at Michigan State University in 1978; and she is a co-founder of The Center for Stress Medicine in San Jose, California. (*Id.* at 675.) In support of her claim that plaintiff suffered from hypothyroidism and adrenal fatigue, Dr. Rinker referred to attached copies of blood tests. (*Id.* at 672.)

Second, Plaintiff submitted a report from Brian Goldman, M.D.,[2] who had performed a single proton emission computed tomography ("SPECT") scan of Plaintiff's brain. Dr. Goldman obtained his medical degree from the University of the Witwatersrand Medical School, in Johannesburg, South Africa; he has been the Medical Director for the Bay Area Laboratory Co-operative ("BALCO") since 1984; but he does not appear to be licensed to practice medicine in California.[3] (*Id.* at 748–50.) After reviewing the SPECT scan results, Dr. Goldman concluded that Plaintiff suffers from "abnormal blood flow to portions of her brain." (*Id.* at 734.) Dr. Goldman also opined that Plaintiff had hypothyroidism, and an endocrine imbalance disorder resulting from adrenal exhaustion. (*Id.* at 736.) Dr. Goldman based these diagnoses on the laboratory blood work performed by Dr. Rinker, and an "Adrenal Stress Test" performed at the Amen Clinic. (*Id.*) Dr. Goldman stated that "[a]ll of these conditions appear to be the result of Lyme disease and co-infections." (*Id.* at 738.)

Third, Plaintiff submitted the report of Deborah Metzger, M.D., who diagnosed Plaintiff with Lyme disease and co-infections of Bebesiosis, Ehrlichiosis, and Bartonella Henselae. (*Id.* at 811.) Dr. Metzger is board-certified in gynecology and reproductive endocrinology. (*Id.* at 810.) Dr. Metzger sent Plaintiff to the IGeneX, Inc. laboratories to be tested for Lyme disease. (*Id.* at 811.) Interpreting the results from the lab, Dr. Metzger concluded that Plaintiff has "an entrenched Lyme Disease infection." (*Id.*) Dr. Metzger also found that the test results were positive for co-infections of Babesiosis, Ehrlichiosis, and Bartonella Henselae. (*Id.*) Dr. Metzger opined that Plaintiff's hypothyroidism, adrenal fatigue, and impaired blood flow to the brain were the result of the Lyme disease and associated infections. (*Id.* at 812.)

In response to the appeal, Defendant had Plaintiff's file reviewed by five different doctors. First, Allan J. Morrison, Jr., M.D., wrote a report on January 6, 2006. (*Id.* at 1051.) Dr. Morrison received his medical degree from the University of Virginia; he is a Professor and Distinguished Senior Fellow at the George Mason School of Public Policy; an Assistant Clinical Professor at the Georgetown University School of Medicine; and he is board-certified in infectious diseases and internal medicine. (*Id.* at 1078.) With regard to Dr. Rinker's diagnosis of adrenal fatigue and hypothyroidism, Dr. Morrison noted

---

**2.** At certain points in the record, Dr. Goldman is referred to as Dr. Halevie–Goldman. (*See, e.g.,* AR, at 740.) For the purpose of clarity, the Court refers to him as Dr. Goldman in this Order.

**3.** In fact, it appears that Dr. Goldman has been suspended from practice by the California Medical Board in the past, and is currently on probation. (Shea Decl., Ex. B.)

that the "documentation of these diagnoses is unclear." (*Id.* at 1052.) He noted that Plaintiffs TSH level was documented as normal, and that there was no data indicating Plaintiff's "serum cortisol levels," and no "Cortrosyn Stimulation Test." (*Id.*) Thus, "[n]otwithstanding the fact that I am an infectious diseases specialist, I see no compelling documentation to support these diagnoses." (*Id.*) With regard to Lyme disease and co-infections, Dr. Morrison said that he had been "provided no serologic data whatsoever to substantiate any diagnosis pertaining to these microorganisms." (*Id.*) Furthermore, Dr. Morrison noted no evidence of an erythema chronicum migrans cutaneous eruption ("ECM rash"), which is present in 90% or more of individuals with Lyme disease. (*Id.*) Thus, Dr. Morrison concluded that there was "nothing in the records provided to substantiate any infectious diseases diagnosis." (*Id.* at 1052–53.)

On February 2, 2006, Dr. Morrison wrote a follow-up report specifically addressing the testing results from the IGeneX labs. (*Id.* at 1076.) Based on his analysis of the lab results, Dr. Morrison found flaws with Dr. Metzger's diagnosis for Babesia Microti, Bartonella Henselae, and Ehrlichiosis. First, with regard to the diagnosis for Babesia Microti, Dr. Morrison noted that "[e]ven the text explanation of the lab results mandates the requirement for paired samples such that interpretation of the modestly elevated IgM titer could be assessed." (*Id.*) The paired sample was lacking, however, and Dr. Morrison found that the negative IgG "strongly supports the lack of substantive exposure to this organism in [Plaintiff's] past." (*Id.*) Second, with regard to the diagnosis for Bartonella Henselae, Dr. Morrison again noted that the "lab's own diagnostic criteria were not met in applying the interpretation of this low positive IgG titer," indicating that Dr. Metzger had "over-interpreted laboratory results per-

taining to this microorganism." (*Id.*) Thus, he found that the serological data did "not warrant the diagnosis of Bartonella infection." (*Id.*) Third, with regard to the diagnosis for Ehrlichiosis, Dr. Morrison noted that the "[t]esting for ehrlichiosis resulted in negative titers for IgM and IgG notwithstanding references in the record" by Dr. Metzger that plaintiff had the disease. (*Id.* at 1077.)

Finally, with regard to the Western Blot tests for Lyme Disease, Dr. Morrison found that "while there is a band-positive test result, ... [n]either the IgM nor the IgG fulfill CDC criteria for positive Lyme serology." (*Id.*) Dr. Morrison took issue with Dr. Metzger's methodology for interpreting the Western Blot test because she relied on "predominantly internet and web based information which is clearly distant from mainstream medical practice and thought." (*Id.*) He noted that the information relied upon was "toxic, dangerous, and do[es] not represent the standard of care." (*Id.*) He further noted that there appears to be a "preferred relationship with [IGeneX labs] which uses different methodology and laboratory cut points for defining positive and negative results." (*Id.*) As a result, Dr. Morrison found "no substantiation whatsoever of Lyme disease in this woman based upon objective documentation." (*Id.*)

The second doctor to review Plaintiff's file on behalf of Defendant was Louis V. Kirchoff, M.D. (*Id.* at 1112.) Dr. Kirchoff received his medical degree from Yale University; he is a Professor of Internal Medicine, Infectious Diseases, and Epidemiology at the University of Iowa; and he is board-certified in internal medicine and infectious diseases. (*Id.* at 1117.) Dr. Kirchoff submitted a report dated March 27, 2006, addressing Plaintiff's diagnoses for (1) Lyme disease, (2) Ehrlichiosis, (3) Bartonella Henselae, and (4)

Babesiosis. (*Id.* at 1112.) First, with regard to Lyme disease, Dr. Kirchoff analyzed the results from the IGeneX lab tests and noted that, while the Western Blot test indicated a positive result, when using criteria established by the CDC, the result was negative. (*Id.* at 1113.) He found Dr. Metzger's diagnosis to be "an over-interpretation of the test results reported from her preferred testing site, which ... has a tendency to give more positive results than do other laboratories." (*Id.*) Second, with regard Ehrlichiosis, Dr. Kirchoff noted that the result of one of the tests was at the lowest end of the range that may be indicative of an infection, and in such circumstances, paired testing collected six to eight weeks apart is recommended, which had never happened. (*Id.* at 1114.) Thus, he concluded it was "simply not reasonable to base a diagnosis of ehrlichiosis on a minimally elevated IgG titer in the absence of testing of paired specimens of some other evidence of infection with the organism." (*Id.*) Third, with regard to Bartonella infection, Dr. Kirchoff found that Dr. Metzger had misinterpreted the test results and, in actuality, "the IGeneX tests for Bartonella infection in the claimant were negative by the criteria stated by IGeneX." (*Id.*) Finally, with regard to Babesia infection, Dr. Kirchoff concluded that the test was negative. (*Id.*) Although the test noted that paired testing was recommended, there was no indication that Dr. Metzger had performed it. (*Id.* at 1115.) Thus, Dr. Kirchoff concluded that the statements made by Dr. Metzger diagnosing Plaintiff with these diseases were "not supported by the testing results obtained from her preferred laboratory." (*Id.*) Dr. Kirchoff also noted that any statements related to these four diseases made by Drs. Goldman and Rinker did not have any independent basis because they were relying on Dr. Metzger's interpretation of the IGeneX test results. (*Id.* at 1115–16.)

On March 26, 2006, Dr. Kirchoff sent a letter to Dr. Metzger seeking more information on her diagnoses for Lyme disease, Ehrlichiosis, Bartonella Henselae, and Babesiosis. (*Id.* at 1122.) In response, Dr. Metzger did not immediately respond to the specific questions; she simply mailed Dr. Kirchoff copies of four articles that she thought addressed the issue. (*Id.* at 1133.)

Dr. Kirchoff also sent follow-up letters to Drs. Goldman and Rinker. (*Id.* at 1237, 1242.) On April 25, 2006, Dr. Goldman sent a response letter in which he noted that he is "not an infectious disease expert," but that based on his evaluation of Plaintiff's neurological, psychiatric, and endocrinological function, it was "reasonable to assume" that Lyme disease could have been contributing to her symptoms. (*Id.* at 1240.) Dr. Goldman stated that although he "did not scrutinize the lab results" from Dr. Metzger, in his opinion, Plaintiff tested positive for Lyme disease. (*Id.*)

Dr. Rinker also responded to Dr. Kirchoff by letter on May 11, 2006. (*Id.* at 1245.) Dr. Rinker pointed out that the CDC standards that Dr. Kirchoff seemingly relied on were the "criteria for epidemiological reports, not diagnosis." (*Id.* at 1246.) Dr. Rinker stated that the CDC has made no attempt to define diagnostic criteria for Lyme disease, and that the CDC criteria were to be used for the purposes of reporting only. (*Id.*) In her clinical experience, however, Dr. Rinker stated that all that is needed for a positive Western Blot test for Lyme disease is "one species specific positive band," and that in the testing results, Plaintiff had five positive bands for IgM and four for IgG. (*Id.*) Thus, Dr. Rinker stood by her earlier diagnosis for "active Lyme infection, with concurrent hypothyroidism and adrenal fatigue," which she contended

were "confirmed by the laboratory tests." (*Id.* at 1247.)

After receiving these responses, Dr. Kirchoff wrote a letter to Defendant summarizing that the responses of Drs. Goldman and Rinker did not alter his analysis. (*Id.* 1233.) With regard to Dr. Goldman's response, Dr. Kirchoff said that his diagnosis for Lyme disease was "an overinterpretation of the test results provided by IGeneX." (*Id.*) With regard to Dr. Rinker's response, Dr. Kirchoff disagreed with her opinion that "a single band on either an IgM or IgG western blot is sufficient to confirm a diagnosis of Lyme disease." (*Id.* at 1234.) Dr. Kirchoff found this approach to be "beyond the generally accepted standards, and also beyond the standards provided in the IGeneX reports." (*Id.*) If Dr. Rinker's theory were followed, Dr. Kirchoff opined that "approximately 50% of people in the general population would test positive for Lyme disease." (*Id.*)

Defendant retained a third doctor to review Plaintiff's files, Gary Greenhood, M.D., who addressed Plaintiff's diagnoses for hypothyroidism, adrenal fatigue, and impaired blood flow to the brain. (*Id.* at 1312.) Dr. Greenhood is certified by the American Board of Internal Medicine in internal medicine and infectious diseases. (*Id.* at 1317.) Dr. Greenhood refuted the diagnosis of hypothyroidism, noting that Plaintiff's levels of T3 and T4 were normal in July of 2005. (*Id.* at 1316.) With regard to adrenal fatigue, Dr. Greenhood noted that Dr. Rinker's own diagnostic code in her June 23, 2004 report did not list adrenal fatigue as one of the ailments indicated by the results. (*Id.*) Moreover, he noted no cortisol deficiency and found Plaintiff's total testosterone to be normal. (*Id.*) With regard to impaired blood flow to the brain, Dr. Greenhood said that in order to determine the significance of the SPECT scan, it would have to be compared to a CT or MRI scan of the brain.

(*Id.*) In the absence of such testing, the clinical significance of the "allegedly abnormal SPECT scan" could not be determined. (*Id.*) Thus, Dr. Greenhood found that the record did not support a finding of physical impairment based on any of these three ailments. (*Id.*)

The fourth doctor to examine Plaintiff's records was Amy Hopkins, M.D., who is board-certified in internal medicine and occupational and environmental science. (*Id.* at 1342, 1346.) Like Dr. Greenhood before her, Dr. Hopkins addressed the diagnoses of hyperthyroidism, adrenal fatigue, and the abnormal blood flow to the brain. (*Id.* at 1342.) She criticized Dr. Rinker's diagnosis for hypothyroidism because Plaintiff's tests for thyroid antibodies were negative, and it appeared to her that "the diagnosis of hypothyroidism was made on the basis of the symptoms, which is circular reasoning." (*Id.*) Furthermore, with regard to adrenal fatigue, Dr. Hopkins found no evidence of "typical findings … of increased skin pigmentation, frank hypotension, orthostatic hypotension, or loss of pubic or axillary hair." (*Id.* at 1344.) Thus, Dr. Hopkins found no support for a diagnosis for adrenal fatigue. (*Id.*) Finally, with regard to the SPECT scan, Dr. Hopkins noted that an MRI of the brain done on February 3, 2003 showed no abnormalities consistent with brain damage. (*Id.* at 1345.) She also noted that the utility of SPECT scans is questionable and is "considered experimental and investigational because it cannot reliably distinguish between normals and controls with the sensitivity to establish clinical diagnoses." (*Id.*) Thus, in the absence of confirmatory data, the reportedly abnormal SPECT scan did not support the existence of a specific impairment. (*Id.*)

On the basis of the reports submitted by the four reviewing doctors, on July 6, 2006, Defendant informed Plaintiff that her ap-

peal of their denial had not changed Defendant's decision to deny Plaintiff's application for long-term benefits. (*Id.* at 1358.) Defendant wrote that the evidence submitted with Plaintiff's appeal did not support a finding that Plaintiff suffered from the asserted physical impairments. (*Id.* at 1361–64.)

On July 13, 2006, Dr. Metzger finally responded to Dr. Kirchoff's letter from March 26, 2006, seeking more information on Dr. Metzger's diagnosis for Lyme disease. (*Id.* at 1371.) In the letter, Dr. Metzger disputed Dr. Kirchoff's methodology for interpreting the IGeneX lab results for Lyme disease. Dr. Metzger noted that the Director of the CDC, David Satcher, had stated that " 'the case definition for Lyme disease is meant for statistical, not diagnostic or treatment purposes.' " (*Id.* at 1372.) Furthermore, Dr. Metzger cited legislative history from a 2002 Senate Appropriations Bill, which stated that the CDC surveillance case definition is not appropriate for diagnosis purposes. (*Id.*) Therefore, Dr. Metzger asserted that Dr. Kirchoff's conclusion was in error. With regard to the diagnoses of Ehrlichiosis, Bartonella Henselae, and Babesia, Dr. Metzger argued that the results were affected by the fact that Plaintiff had been on antibiotics at the time, which had affected her interpretation of the results. (*Id.* at 1374.)

Dr. Kirchoff reviewed Dr. Metzger's letter, but found that "[n]one of the statements in Dr. Metzger's letter or any of the information in the materials included with it change my prior opinion." (*Id.* at 1457.)

On August 16, 2006, Plaintiff submitted to Defendant a letter from a new doctor, Raphael B. Stricker, M.D. (*Id.* at 1609.) Dr. Stricker received his medical degree from Columbia University in 1978, and is widely published on the topic of Lyme disease. (*Id.* at 1611.) In the letter, Dr. Stricker stated that he had seen Plaintiff in his office and had reviewed the medical reports generated during Plaintiff's appeal of the benefits denial. (*Id.*) He referred primarily to the tests performed by Dr. Metzger and the SPECT scan performed by Dr. Goldman, which he found consistent with neurologic Lyme disease. (*Id.*) Dr. Stricker took issue with the reports from Drs. Morrison and Kirchoff because they relied heavily on the IGeneX test results to make their determination that Plaintiff did not have Lyme disease. (*Id.* at 1610.) Dr. Stricker stated that it must be remembered that Lyme disease is a "clinical diagnosis, and that laboratory testing can only support but not rule out the disease." (*Id.*) Thus, given Plaintiff's history of exposure in the outdoors, her reported symptoms, and the test results, Dr. Stricker concluded that she was suffering from "inadequately treated neuroborreliosis." (*Id.*)

On August 15, 2006, Dr. Goldman submitted a follow-up letter addressing the validity of the SPECT scan that he performed. (*Id.* at 1636.) Dr. Goldman repeated his claim that Plaintiff had a pattern of decreased blood flow to the brain, which was consistent with an infection for Lyme disease. (*Id.* at 1637.) Given the lab results, Dr. Goldman stated that "it is highly likely the Lyme Disease and Co-Infections that Mrs. Harrison has, are the cause of the brain damage." (*Id.*)

In Light of this additional information from Drs. Metzger, Stricker, and Goldman, submitted after the appeal was denied, Defendant sent the information to its doctors for one more analysis. First, Dr. Hopkins submitted a letter on August 31, 2006, in which she stated that none of the new information changed her conclusion that Plaintiff was not suffering from hypothyroidism, adrenal fatigue, or impaired blood flow to the brain. (*Id.* at 1774.) Similarly, Dr. Kirchoff submitted a letter

on September 12, 2006, in which he stated that he had reviewed the additional materials and that it did not alter his prior opinion that there was no evidence Plaintiff was suffering from infections of Borrelia · Burgdorferi, Bartonella Henselae, Babesia, and Ehrlichiosis. (*Id.* at 1789.)

As an additional measure, however, Defendant had one final doctor, John L. Brusch, M.D., examine Plaintiff's records. (*Id.* at 1877.) Dr. Brusch reviewed Plaintiff's records and submitted a report dated November 17, 2006. (*Id.*) Dr. Brusch received his medical degree from Tufts Medical School; he is a clinical instructor at Harvard Medical School; and he is board-certified in internal medicine, geriatric medicine, and infectious disease. (*Id.* at 1879.) Dr. Brusch examined all of the information provided throughout Plaintiff's appeal, and found that "there is no credible evidence that this claimant has contracted the Lyme organism." (*Id.* at 1877.) He noted that in the Western Blot test performed by IGeneX, the "IgM is positive and her IgG is negative," which was "the pattern of a nonspecific reaction." (*Id.*) He further opined that:

> In a claimant who has had symptoms for over three years clearly the Western blot should have converted from IgM to IgG. The PET scan has no role in the diagnosis of central nervous Lyme disease because of its nonspecificity. The claimant has never received analysis of the cerebrospinal fluid, which often will show an antibiotic response to the organism.
>
> In addition, her clinical picture is quite atypical for late Lyme encephalopathy, which usually is manifested by a subtle cognitive disturbance. The more severe variety of encephalopathy with its significant cognitive dysfunction is almost always limited to Europe and its different strain of Lyme organism.

(*Id.* at 1878.) Thus, Dr. Brusch concluded that there was "no objective evidence presented to substantiate the existence of the disease." (*Id.*)

On December 7, 2006, Defendant issued a final determination that Plaintiff was not entitled to further benefits. (*Id.* at 1895.) The letter stated that, based on the review of its infectious disease specialists, there was no support for a diagnosis of Lyme disease, or any other infectious disease. (*Id.*)

Plaintiff filed this ERISA action on May 31, 2007, challenging Defendant's decision to deny her benefits. On November 28, 2007, the Court issued an Order Partially Determining Scope of Review, and instructed the parties to file dispositive motions. (Docket No. 38.) On November 3, 2008, the parties filed cross-motions for summary judgment, and on November 17, 2008, the parties filed their reply briefs. The Court held a hearing on November 25, 2008, and now finds the matter suitable for decision.

## III. ANALYSIS

### A. Legal Standard

In the Court's November 28, 2007 ("November Order"), it was determined that the Court will apply abuse of discretion review, with some degree of skepticism due to Defendant's conflicts of interest. (*Id.* at 14.) In the November Order, the Court relied primarily on the precedent established in *Abatie v. Alta Health & Life Insurance Co.,* 458 F.3d 955, 965 (9th Cir. 2006) (en banc). (*See id.* at 5.) The Court rejected Plaintiff's argument that there was evidence of wholesale and flagrant violations of the requirements of ERISA, which could warrant the application of de novo review. (*Id.* at 8.) Addressing Defendant's conflicts of interest, the Court found that a structural conflict of interest exists because Defendant both funds and admin-

isters the Plan. (*Id.* at 9.) The Court noted that since Dr. Greenhood is a consultant employed by Defendant, that some heightened skepticism was warranted, albeit of a limited nature. (*Id.* at 10.) The Court also said that it would take into account the fact that the reviewing physicians lacked specific expertise in the area of SPECT scans. (*Id.* at 11.) Finally, the Court noted that Dr. Hopkins was not aware of Dr. Rinker's diagnosis, which was a procedural irregularity that should be taken into account. (*Id.* at 12.) The Court also noted that it would reconsider Plaintiff's other arguments for the appropriate standard of review at the dispositive motion stage if Plaintiff were to present further evidence in support of Plaintiff's arguments. (*Id.* at 14.)

After reviewing the additional evidence submitted in connection with the instant motions, the Court largely reaffirms the ruling in the November Order. The parties, however, have submitted some additional material which the Court must take into consideration at this stage of the proceedings.

1. *Metropolitan Life Insurance Co. v. Glenn*

▇ As an initial matter, in June of 2008, the Supreme Court issued its decision in the case of *Metropolitan Life Insurance Co. v. Glenn*, —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). In *Glenn*, the Court revisited its holding in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), and reaffirmed that courts should be "guided by principles of trust law" when determining the appropriate standard of review. *Id.* at 2347. As such, "[i]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Id.* at 2348 (emphasis and quotations omit-

ted). The Court provided guidance on how the conflict of interest should be taken into consideration:

> The conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to a vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interest in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

*Id.* 2351. The Court noted that there was no exact way to apply this standard, but that the "want of certainty in judicial standards partly reflects the intractability of any formula to furnish definiteness of content for all the impalpable factors involved in judicial review." *Id.* at 2352.

Applying the Supreme Court's decision in *Glenn* to this case, the Court notes that Defendant Unum Life Insurance Company of America has had a history of biased claims administration. Indeed, in a law review article specifically cited in *Glenn*, the author detailed a scandal involving the Unum companies, where the claims processing employees were pressured by management to deny valid claims. *See* JOHN H. LANGBEIN, TRUST LAW AS REGULATORY LAW, 101 Nw. U.L. REV. 1315, 1318 (2007). Company management allegedly set budget goals and encouraged employees to deny claims so that they could meet and surpass those goals. *Id.* The scandal received public attention in 2002 when news media exposed some of the company's tactics. *Id.* In light of this reputation,

*Glenn* instructs the Court to pay more attention to the effect the conflict of interest had in Defendant's decision to deny Plaintiff's claim. *See* 128 S.Ct. at 2351. Additionally, there is no evidence in the record to suggest that Defendant has taken the steps identified in *Glenn,* such as walling off administrators and penalizing inaccurate decisionmaking, that would reassure the Court as to the limited nature of the conflict. *See id.* Thus, the Court will take Defendant's history into account when performing its review.[4]

## 2. New Evidence

■ The parties have submitted new evidence in this case that was not before the Court when the November Order was issued. Thus, the Court must assess this evidence under the framework of *Abatie* and *Glenn.* In *Abatie,* the Ninth Circuit noted that the "level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." 458 F.3d at 968. On the other hand, however, a court may weigh a conflict more heavily if (1) the administrator provides inconsistent reasons for denial, (2) fails adequately to investigate a claim or ask the plaintiff for necessary evidence, (3) fails to credit a claimant's

reliable evidence, (4) has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly, (5) or by making decisions against the weight of evidence in the record. *Id.* In light of the new evidence submitted, the Court will address each of these factors in turn.[5]

There is no evidence in the record that Defendant acted with malice toward Plaintiff during the claim process. To the contrary, throughout the appeal, the record shows that Defendant handled Plaintiff's claim in a courteous and professional manner (*see, e.g.,* AR, at 1640), and Plaintiff has not provided any other evidence that would support a finding of malice.

Plaintiff makes several allegations of self-dealing and bias based on Defendant's choice of reviewing doctors. Plaintiff alleges that all of the doctors that Defendant chose make a living from reviewing claims for insurance companies, and they have a record of submitting reports that favor insurance companies. A careful review of Plaintiff's allegations, however, reveals that, for the most part, the doctors Defendant retained were relatively independent. For example, the discovery in this case reveals that this was the only case that Dr. Kirchoff had offered a physician review on Defendant's behalf. (*See* Interrog. Resp., at 16.) With regard to Dr. Brusch, Plaintiff has provided no evidence that he had ever reviewed another case for Defendant.[6]

4. The Court notes that the Supreme Court's decision in *Glenn* is largely consistent with the preexisting controlling Ninth Circuit authority that the Court applied in its November Order. *See Burke v. Pitney Bowes Inc. Long–Term Disability Plan,* 544 F.3d 1016, 1029 (9th Cir.2008) (instructing the district court to apply the *"Metlife/Abatie* standard" on remand); *Toven v. Metropolitan Life Ins. Co.,* 2008 WL 5101727, at *8 n. 6 (C.D.Cal.2008) (*"Glenn* is entirely consistent with the previously governing framework for ERISA cases set forth in *Abatie."*).

5. District courts may "consider evidence outside the administrative record to decide the

nature, extent, and effect on the decision-making process of any conflict of interest." *Abatie,* 458 F.3d at 970.

6. During the course of this litigation, the Court allowed Plaintiff to conduct discovery into Defendant's conflicts of interest. On August 20, 2008, Plaintiff asked the Court to order Defendant to respond to certain discovery requests. (*See* Docket No. 58.) Notably, however, Plaintiff did not ask Defendant for any information regarding Dr. Brusch's potential conflicts. Plaintiff inquired about every other doctor except, for some reason, Dr. Brusch. If Plaintiff had asked for this infor-

Moreover, this was only the second case that Dr. Morrison had ever reviewed for Defendant. (*Id.* at 17.)

Plaintiff argues that Dr. Hopkins is biased because she is the former medical director of Aetna U.S. Healthcare, and cites evidence that Dr. Hopkins derived 99% of her annual income from performing reviews for insurance companies. However, the discovery in this case revealed that Dr. Hopkins has only submitted five such reviews at Defendant's request since 1997. (Interrog. Resp., at 18.) Furthermore, in the two other cases Plaintiff cites where Dr. Hopkins provided a review on behalf of the insurance company, the courts found that the administrator had not abused its discretion in denying the claim. *See Gothard v. Metropolitan Life Ins. Co.*, 491 F.3d 246 (5th Cir.2007); *Bergquist v. Aetna U.S. Healthcare*, 289 F.Supp.2d 400 (S.D.N.Y.2003).

As already discussed in the November Order, the Court notes that Dr. Greenhood is employed by Defendant, and the Court will take this potential conflict of interest into consideration when evaluating the medical opinions that he offered. For the most part, however, the Court finds the level of bias relatively low given that Defendant used five doctors, three of which have had very little experience working with Defendant in the past. To the extent that there is any conflicts, however, the Court will be mindful of them when reviewing the record.

As discussed earlier, the Court notes that Defendant has a "parsimonious claims-granting history," which was specifically identified in *Glenn*, 128 S.Ct. at 2351. As a result, the Court will certainly consider this as a factor warranting more skepticism in the review.

There is no evidence on the record that Defendant provided inconsistent reasons for denying Plaintiff's claim. Since 2005, when Plaintiff's benefits were terminated and she made her appeal, Defendant has been consistent in its position that Plaintiff's ailment was, if anything, mental, not physical. (*See* AR, at 402, 1358, 1895.) Thus, this factor does not weigh in favor of greater skepticism.

Nor is there any evidence that the Defendant has failed to adequately investigate the claim. To the contrary, Defendant had five different doctors review Plaintiff's claim, and these doctors have communicated with Plaintiff's doctors extensively to obtain additional information regarding the treating physician's diagnoses. (*See, e.g.,* AR, at 1122.) In the November Order, the Court noted that it appeared Dr. Hopkins had not been provided with the report of Dr. Rinker among the items that Dr. Hopkins reviewed in making her evaluation and report. Defendant, however, has pointed to specific evidence in the record, where Dr. Hopkins clearly indicates that this information was provided to her. (*See* AR, at 1342.) Thus, this is no longer a factor that the Court will consider.

With regard to the factor that an administrator cannot fail to credit reliable evidence produced by Plaintiff, this inquiry merges somewhat with the underlying substantive abuse of discretion of analysis. For this proposition, the Ninth Circuit in *Abatie* cited to *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). The relevant portion from *Nord* states that plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physi-

mation, the Court would have certainly granted the request like it did with regard to the other four doctors involved. (*See* Docket No.

61.) Thus, there is no evidence regarding Dr. Brusch's potential conflicts simply because Plaintiff failed to ask about them.

cians." *Id.* The Court, however, noted a distinction between refusing to credit reliable evidence, and offering reliable evidence that conflicts with the claimant's evidence. *Id.* With respect to the latter, the Court said that there is no special burden of explanation that attaches when reliable conflicting evidence is submitted. *Id.*

Here, the Court is satisfied that Defendant has not simply disregarded the reports from Plaintiff's doctors. Defendant has hired competent people to thoroughly examine Plaintiff's reports, and they have simply disagreed with the results offered by Plaintiff's doctors. In some instances, Defendant's doctors have identified internal inconsistencies in Plaintiff's reports. In any event, Defendant has addressed the opinions offered by Plaintiff's doctors, and has not simply disregarded it or dismissed it off hand. To the extent that the Court has any concerns regarding the accuracy of the Defendant's doctors, this will be addressed in the substantive abuse of discretion analysis.

There is no indication that Defendant has repeatedly denied deserving participants by interpreting plan terms incorrectly. Plaintiff has submitted no evidence that, in other cases, Defendant has interpreted the term of the Plan at issue here incorrectly. This is most likely because there is no real issue with interpreting the terms of the Plan; the issue is whether Plaintiff has a physical disability.

Finally, to the extent that Plaintiff argues that Defendant has made decisions against the weight of the record, this will be addressed during the abuse of discretion analysis.

In sum, having considered the factors outlined in *Glenn* and *Abatie*, the Court finds that although the discretionary review is at warranted here, certain factors weigh in favor of heightened skepticism. Besides the fact that there is a structural conflict of interest given that Defendant funds and administers the Plan, the Court also notes Defendant's choice of hiring Dr. Greenhood, who is also an employee of Defendant. Dr. Hopkins is not entirely independent, although she has reviewed only five claims for Defendant since 1997. Moreover, Defendant has a "parsimonious claims-granting history" which the Court will certainly consider. Viewing these factors together, the Court will apply a more skeptical form of abuse of discretion review.

### B. Abuse of Discretion

The central issue before the Court is whether Defendant abused its discretion in deciding that Plaintiff was not suffering from a physical ailment, such that Plaintiff would be covered by the Policy. Throughout the administrative claims process, Plaintiff submitted multiple doctors' reports, and Defendant responded with reports of their own. The Court's role now is to determine whether Defendant's final conclusion, that Plaintiff was not suffering from the physical ailments that she claimed, was an abuse of discretion.

 Under traditional abuse of discretion analysis, "[a]n ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir.2005). Plaintiff's primary contention appears to be that Defendant's conclusion was based on clearly erroneous findings of fact. "A finding is 'erroneous' when although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id.* A plan administrator's

decision to deny benefits should be upheld " 'if it is based upon a reasonable interpretation of the plan's terms and was made in good faith.' " *Id.* (quoting *Estate of Shockley v. Alyeska Pipeline Serv. Co.,* 130 F.3d 403, 405 (9th Cir.1997)). On the other hand, it should be reversed if a review of "the entire record leads to a 'definite and firm conviction that a mistake has been committed." ' *Id.* at 1179 (quoting *Concrete Pipe & Prods. of Cal. Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). While this is the traditional standard, the Court apply more searching judicial scrutiny than would otherwise be applied absent the existing conflicts of interest.

█ Plaintiff asserts that Defendant erred by rejecting Plaintiff's medical evidence that her ailments were caused by the following five physical diseases: (1) Lyme disease; (2) co-infections of Babesiosis, Ehrlichiosis, and Bartonella Henselae; (3) hypothyroidism; (4) adrenal fatigue; and (5) brain damage.

### 1. Lyme Disease

Plaintiff argues that Defendant erred in concluding that Plaintiff did not have Lyme disease because Defendant relied on a standard promulgated by the CDC, which the CDC has expressly stated should only be used for reporting, but not diagnosis purposes. (Pl.'s Mot., at 9–11.) Specifically, Plaintiff takes issue with the reports from Drs. Morrison and Kirchoff. Plaintiff points out that both referenced a standard from the CDC when evaluating Plaintiff's Western Blot test results. In his report dated February 2, 2006, Dr. Morrison rejected Dr. Metzger's interpretation of the Western Blot test performed by the IGeneX lab noting that " while there is a band-positive test result, ... [n]either the UGM nor the IgG fulfill CDC criteria for positive Lyme serology." (AR,

at 1077.) Similarly, in his March 27, 2006 report, Dr. Kirchoff appears to have relied on the CDC criteria when interpreting the Western Blot test results from the IGeneX lab. (*Id.* at 1112.) Dr. Kirchoff noted that while the Western Blot test indicates a positive result, when using the criteria established by the CDC, the result is negative. (*Id.* at 1113.)

Plaintiff submitted letters from doctors who pointed out that the CDC standards are not appropriate for diagnosis purposes. First, Dr. Rinker sent a letter to Dr. Kirchoff dated May 11, 2006, in which she cited an article that stated that the CDC standards are the "criteria for epidemiological reports, not diagnosis." (*Id.* at 1246.) Dr. Rinker further informed Dr. Kirchoff that the CDC had not attempted to define the standards for diagnosing Lyme disease and, therefore, his reliance on those standards was in error. (*Id.*) Second, Dr. Metzger sent a letter to Dr. Kirchoff on July 13, 2006, in which she noted that the Director of the CDC, David Satcher, had expressly stated that the CDC's case definition for Lyme disease is meant for statistical, but not diagnostic or treatment purposes. (*Id.* at 1372.) Dr. Metzger also referenced legislative history from a 2002 Senate Appropriations Bill, which stated that the CDC reporting criteria is not appropriate for diagnostic purposes. (*Id.*) On this basis, Dr. Metzger informed Dr. Kirchoff that she thought his interpretation of the Western Blot test was critically flawed.

After Dr. Metzger's letter, Dr. Kirchoff did not respond specifically to the allegation that he had relied on the wrong standard by referencing the CDC criteria. Rather, he summarily stated that none of the statements in the letter or the information included with it changed his prior opinion. (*Id.* at 1457.)

Plaintiff states valid criticisms of the criteria that Drs. Morrison and Kirchoff used to evaluate her diagnosis for Lyme disease. Without more, the Court might be inclined to find that Defendant made a mistake in interpreting the results of the Western Blot tests.[7] Importantly, however, Defendant took the further step of referring Plaintiff's diagnosis to an additional doctor, Dr. Brusch, who submitted a final report, which sufficiently rebuts the charge that Defendant's doctors relied on the wrong medical standard.

Dr. Brusch's report was submitted on November 17, 2006, after the back and forth between Drs. Morrison, Kirchoff, Rinker, and Metzger had occurred regarding the use of the CDC standard for interpreting the Western Blot test. (AR, at 1877.) In this report, unlike Drs. Morrison and Kirchoff, Dr. Brusch made no reference whatsoever to the CDC standards.[8] Nor did he conclude like Drs. Morrison and Kirchoff, that when applying a standard other than the one indicated on the IGeneX Western Blot test itself, that the result of the test was actually negative. Instead, Dr. Brusch simply accepted that results for what they said: that Plaintiff's "IgM is positive and her IgG is negative." He then stated that "[t]his is the pattern of nonspecific reaction." In his opinion, "[i]n a claimant who has had symptoms ... over three years clearly Western blot should have converted from IgG." (*Id.* at 1877–78.) Thus, he concluded that the test results did not support the conclusion that Plaintiff had Lyme disease.

Although Dr. Brusch's interpretation of the Western Blot test results is not incredibly detailed, even his brief analysis is entitled to significant weight given his expertise in the field. Dr. Brusch is a clinical instructor at Harvard Medical School and he is board-certified in infectious disease and internal medicine. (*Id.* at 1863.) Moreover, there is no evidence that Dr. Brusch was operating under a conflict of interest.[9] In light of these considerations, the Court finds Dr. Brusch's expert opinion sufficient to rebut Plaintiff's charge that Defendant's doctors relied on the incorrect CDC standard when interpreting the Western Blot test.

Plaintiff also submitted the report of Dr. Stricker, who was critical of the reports from Drs. Morrison and Kirchoff as they related to Plaintiff's diagnosis of Lyme disease. (*Id.* at 1609.) Dr. Stricker did not make specific criticisms regarding the use of the CDC standard for interpreting the results of the Western Blot test. Rather, he took issue with heavy reliance by Drs. Morrison and Kirchoff on laboratory test results to conclude that Plaintiff was not suffering from Lyme disease. Dr. Stricker noted that it must be remembered that Lyme disease is a "clinical diagnosis, and that laboratory testing can only support but not rule out the disease." (*Id.* at 1610.)

Assuming this criticism is valid, a close look at the record reveals that Defendant's doctors took other factors into consideration to make a clinical determination that Plaintiff does not have Lyme disease. For

---

7. Although, while the CDC standard should not be the dispositive factor, it could still be relevant to some extent for determining whether a claimant has Lyme disease.

8. Plaintiff argues that although Dr. Brusch did not make explicit reference to the CDC standards, he implicitly relied upon them. There is no support in the record for this assertion. Instead, it appears that Dr. Brusch

was relying on his own medical expertise when offering his conclusion that the Western Blot test did not support a diagnosis of Lyme disease.

9. As mentioned earlier, the reason why there is no evidence regarding Dr. Brusch's potential conflicts is because Plaintiff failed to ask about it during discovery. *See supra* note 6.

example, in his first report, Dr. Morrison found no evidence that Plaintiff had ever experienced an ECM rash, which he said was present in 90% or more of individuals with Lyme disease.[10] (AR, at 1052–53.) Dr. Brusch also relied on factors other than just the Western Blot test results. He found that Plaintiff's "clinical picture is quite atypical for late Lyme encephalopathy, which usually is manifested by a subtle cognitive disturbance. The more severe variety of encephalopathy with its significant cognitive dysfunction is almost always limited to Europe and its different strain of Lyme organism." (*Id.* at 1878.) Moreover, Dr. Brusch noted that Plaintiff had not received any analysis of her "cerebrospinal fluid, which often will show an antibiotic response to the organism." (*Id.* at 1878.)

With regard to these other clinical factors, Dr. Stricker's report made certain findings regarding Plaintiff's past health conditions. (*See id.* at 1609.) For example, he noted that Plaintiff has a "history of extensive tick exposure during 20 years of backpacking and camping around Northern California, Colorado and Mt. Whitney. She noted 'insect bites' with rashes on several occasions but did not seek treatment." (*Id.*) Dr. Stricker found this to be a "significant tick exposure history" and "appropriate dermatologic history" to support the diagnosis for Lyme disease. (*Id.* 1610.) Notably, however, nowhere is his report does Dr. Stricker ever state that Plaintiff specifically experienced an ECM rash. Furthermore, the reliability of this report must be questioned given that the sole source of Dr. Stricker's information regarding Plaintiff's tick exposure and dermatologic history

was Plaintiff's own recollection. Dr. Stricker did not interview Plaintiff until April 28, 2006, when Plaintiff was in the midst of this appeal. (*See id.* at 1609.) Dr. Stricker did not have any independently verifiable evidence, but had to rely on Plaintiff's own description of her medical history. Moreover, Dr. Brusch had the benefit of Dr. Stricker's report, and even he found "no objective evidence ... to substantiate the existence of [Lyme] disease." (*Id.* at 1878.)

In conclusion, after receiving the record, the Court is satisfied that there is sufficient medical evidence to support Defendant's conclusion that Plaintiff does not have Lyme disease. Although Drs. Morrison and Kirchoff may have relied on a standard from the CDC that is not supposed to be used for the purposes of diagnosis, Defendant sent Plaintiff to Dr. Brusch, who did not rely on the CDC standard. Furthermore, Defendant's doctors did not rely exclusively on the Western Blot test results; they considered other factors such as the absence of an ECM rash and the significance of Plaintiff's symptoms. Thus, Defendant did not abuse its discretion in this regard.

### 2. Co–Infections

Plaintiff also argues that the weight of the evidence supports a finding that Plaintiff has various co-infections associated with Lyme disease. Specifically, Plaintiff claims that she suffers from (1)Babesiosis, (2) Ehrlichiosis, and (3) Bartonella Henselae. The sole source of these diagnoses is the November 21, 2005 report from Dr. Metzger, which was based on interpretation of the IGeneX lab tests.[11] (AR, at 811.)

---

**10.** Plaintiff disputes the accuracy of the 90% number. (Pl.'s Mot., at 10.) Plaintiff argues that, at best, the ECM rash is only reported in 35% to 60% of patients with Lyme disease. (*Id.*) Even if the percentage is less than 90%,

however, absence of the ECM rash is still significant for diagnosis purposes.

**11.** Although Drs. Rinker and Goldman stated at different times that Plaintiff was suffering from these diseases, they had no independent

Dr. Metzger's diagnosis was convincingly refuted, however, by Drs. Morrison and Kirchoff. In Dr. Morrison's February 2, 2006 report, he noted that with regard to the diagnosis of Babesiosis, the lab results were positive for IgM and negative for IgG. (*Id.* at 1076.) Dr. Morrison noted that "a negative IgG strongly supports the lack of substantive exposure to this organism in this woman's past." (*Id.*) Moreover, the text of the test results mandated paired samples in such circumstances so that the modestly elevated IgM could be assessed. (*Id.*) However, this data was lacking. (*Id.*) With regard to Bartonella Henselae, Dr. Morrison noted that the "lab's own diagnostic criteria were not met in applying the interpretation of this low positive IgG titer." (*Id.*) Dr. Morrison concluded that the "serologic titer in the realm of this woman's positive IgG does not warrant the diagnosis of Bartonella infection." (*Id.*) Finally, with regard to Ehrlichiosis, Dr. Morrison noted that even though Dr. Metzger had said the test results were positive, the titers for IgM and IgG were both negative. (*Id.* at 1077.) Indeed, the Court's own examination of the test confirms Dr. Morrison's conclusion. (*See* AR, at 833.)

Dr. Kirchoff also rebutted Dr. Metzger's diagnosis for the asserted co-infections. (*Id.* at 1114.) First, with regard to Ehrlichiosis, Dr. Kirchoff found that although one of the tests was at the lowest end of the range that may be indicative of an infection, it was "simply not reasonable to base a diagnosis of Ehrlichiosis on a minimally elevated IgG titer in the absence of testing of paired specimens or some other evidence of infection." (*Id.*) Second, with regard to Bartonella Henselae, Dr. Kirchoff noted that the test was negative by

the test's own criteria. (*Id.*) Third, with regard to Babesiosis, Dr. Kirchoff found that the "negative IgG result definitively undermines the concept that ... the patient was chronically infected with Babesia." (*Id.* at 1115.)

In sum, Defendant had two highly qualified doctors review the test results, and both found critical errors with Dr. Metzger's diagnosis that Plaintiff was infected with the three co-infections. In a letter dated July 13, 2006, Dr. Metzger attempted to explain her misinterpretation of the test results by noting that Plaintiff had been on antibiotics at the time of the testing, which affected how she interpreted the admittedly low results. (*Id.* at 1374.) However, Dr. Metzger did not explain why, if the test results were low, and the test itself mandated re-testing, no such further tests were performed. Moreover, after reviewing this letter from Dr. Metzger, Dr. Kirchoff said that her explanations did not change his prior evaluation of the results. (*Id.* at 1457.) Thus, the Court is satisfied that there is substantial evidentiary basis to support Defendant's conclusion that Plaintiff does not have co-infections of Babesiosis, Ehrlichiosis, or Bartonella Henselae.

### 3. Hypothyroidism

Plaintiff's third asserted physical ailment is hypothyroidism. Plaintiff's diagnosis for hypothyroidism was based or the examinations performed by Dr. Rinker.[12] Dr. Rinker first diagnosed Plaintiff with the ailment in a report dated October 23, 2003 submitted in connection with Plaintiff's appeal of the June 5, 2003 denial. (*Id.* at 308–09.) On July 28, 2004, Defendant decided to reverse its original denial

---

information to make such a diagnosis. Rather, both relied on Dr. Metzger's diagnosis. (*See* AR, at 737, 1247.)

**12.** Although Drs. Metzger and Goldman opine that Plaintiff has hypothyroidism, they have no independent basis for this diagnosis. (AR, at 735, 1373.)

on the basis that Plaintiff was suffering from a mental illness and could receive benefits for 24 months. (*Id.* at 402.)

After the 24 months expired, and Plaintiff appealed her second denial, Dr. Rinker submitted an additional report dated November 23, 2005, in which Dr. Rinker reasserted the diagnosis of hypothyroidism. (*Id.* at 671.) Dr. Rinker attached laboratory reports of blood tests, which she said show Plaintiff had a "deficiency of both form Free T3 and the storage form of the hormone T4." (*Id.* at 672.) Dr. Rinker also opined that Plaintiff had low blood pressure and body temperature, which correlate with the diagnosis. (*Id.*)

Defendant had three different doctors review the diagnosis for hypothyroidism. First, Dr. Morrison found that the basis of Dr. Rinker's diagnosis was "unclear," but that the "TSH level has been documented as normal," and there was no evidence of "serum cortisol levels" or a "Cortrosyn Stimulation Test." (*Id.* at 1052.) Thus, he found "no compelling documentation" to support the diagnosis for hypothyroidism. (*Id.*)

The second doctor, Dr. Greenhood, refuted the diagnosis for hypothyroidism on the basis that Plaintiff's levels of T3 and T4 were actually normal as of July 2005. (*Id.* 1316.) Similarly, the third doctor to review the records for evidence of hypothyroidism, Dr. Hopkins, found that the test results for thyroid antibodies were actually negative. Dr. Hopkins criticized Dr. Rinker's diagnosis due to the fact that it was apparently made on the basis of Plaintiff's symptoms, which Dr. Hopkins argued was "circular reasoning." (*Id.* at 1342.) Dr. Hopkins submitted an additional letter on August 31, 2006, in which she stated that her determination regarding hypothyroidism had not changed.

In light of the opinions rendered, the Court is satisfied that Defendant's conclusion that Plaintiff did not have hypothyroidism was based on sufficient evidence. Plaintiff offered no additional evidence to respond to the criticisms offered by Drs. Morrison, Greenhood, and Hopkins. Thus, Defendant did not abuse its discretion in denying Plaintiff's claim on this basis.

### 4. Adrenal Fatigue

Much like Plaintiff's claim of hypothyroidism, Plaintiff's claim of adrenal fatigue was based primarily on Dr. Rinker's diagnosis. (*See* AR, at 672.) However, Dr. Goldman also stated that he performed an "Adrenal Stress test . . . to determine the diurnal pattern of Ms. Harrison's adrenal functions." (*Id.* at 736.) Dr. Goldman stated that distribution pattern of the test was abnormal based on the fact that Plaintiff's adrenal functions were much too low in the morning and afternoon. (*Id.*) Dr. Goldman also noted that during the glucose tolerance test, Plaintiff had to lie down from exhaustion. (*Id.*)

Dr. Morrison found the basis for this diagnosis "unclear" and that there was "no compelling documentation" to support the diagnosis for adrenal fatigue. (*Id.* at 1052) The second Dr. Greenhood, found that Dr. Rinker's own diagnostic code in her June 23, 2004 report did not list adrenal fatigue as one of the ailments. (*Id.* at 1317.) Dr. Greenhood further found that Plaintiff had no cortisol deficiency and her testosterone levels were normal. (*Id.*) Finally, Dr. Hopkins reviewed the diagnosis for adrenal fatigue and found no evidence of "typical findings . . . of increased skin pigmentation, frank hypotension, orthostatic hypotension, or loss of public or auxiliary hair." (*Id.* at 1344.) Thus, Dr. Hopkins found no support for adrenal fatigue.

Drs. Morrison, Greenhood, and Hopkins are each sufficiently qualified to offer such opinions on these diagnoses, and, as a result, the Court is satisfied that there was

sufficient basis for Defendant's decision to reject Plaintiff's claim.

### 5. Brain Damage

Plaintiff's claim of brain damage is based on the diagnosis of Dr. Goldman and the results of the single proton emission computed tomography ("SPECT") scan. (*Id.* at 734.) Dr. Goldman performed a SPECT scan on Plaintiff, which reportedly revealed "abnormal blood flow to portions of her brain." (*Id.*) Dr. Goldman said that this diagnosis was consistent with Lyme disease. (*Id.*) Dr. Goldman opined that the abnormal blood flow was the cause of Plaintiff's mood instability, memory problems, anxiety, headaches, diminished social skills, and depression. (*Id.* 735.)

Dr. Greenhood disputed the relevancy of the SPECT scan results, noting that in order to determine the significance of the results, they should be compared to a CT or MRI scan of the brain. (*Id.* at 1317.) In the absence of this additional information, Dr. Greenhood stated that the clinical significance of the "allegedly abnormal" SPECT scan could not be determined. (*Id.*)

Dr. Hopkins found the utility of the SPECT scan questionable because it is "considered experimental and investigational because it cannot reliably distinguish between normals and controls with the sensitivity to establish clinical diagnoses." (*Id.* at 1345.) Dr. Hopkins noted no evidence of brain trauma. (*Id.*) In the absence of confirmatory data, Dr. Hopkins said that the SPECT scan was not sufficient to support a finding of brain damage.

(*Id.*) Similarly, Dr. Brusch dismissed the importance of the SPECT scan because of its "nonspecificity." (*Id.* at 1878.)

In light of the opinions rendered by Drs. Greenhood, Hopkins, and Brusch regarding the significance of the SPECT scan results, the Court is satisfied that Defendant addressed this diagnosis and did not abuse its discretion in deciding that Plaintiff did not suffer from brain damage.

### C. Americans with Disabilities Act ("ADA")

Plaintiff asserts that the provisions in the Plan that put certain limitations on benefits based on whether the ailment is self reported or whether it is a mental illness, violate the ADA.[13] Plaintiff contends that these limitations discriminate against disabled persons.

However, in *Weyer v. Twentieth Century Fox Film Corp.*, the Ninth Circuit held that an "employer-provided disability policy is not a 'place of public accommodation' under Title III." 198 F.3d 1104, 1115 (9th Cir.2000). Even if the ADA applied to such a plan, the Ninth Circuit also found that it would be protected by the safe harbor provision of 42 U.S.C. § 12201(c), which allows an insurer to classify and administer such risks. *Id.* " 'The coverage of mental disability and physical disability involves different risks with different hazards (or exposure).' " *Id.* (quoting *Rogers v. Dept. of Health, Env't Control,* 174 F.3d 431, 437 (4th Cir.1999)). Thus, the Ninth Circuit has rejected the argument that Plaintiff advances here.

---

**13.** The relevant portion of the Plan provides that "[d]isabilities, due to a sickness or injury, which are primarily based on self-reported symptoms, and disabilities due to mental illness, alcoholism or drug abuse have a limited pay period up to 24 months." (AR, at 75.) Mental illness is defined under the Plan as "a psychiatric or psychological condition regardless of cause such as schizophrenia, depres-sion, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders or other conditions." (*Id.* at 90.) Self-reported symptoms are "the manifestations of your condition which you tell your physician, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine." (*Id.* at 91.)

## IV. CONCLUSION

Based on a thorough review of the administrative record, the Court finds that Defendant did not abuse its discretion in denying Plaintiff's claim for disability benefits. Thus, for the reasons stated above, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

**Proceedings:** IN CHAMBERS ORDER AMENDING ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On January 8, 2009, the Court issued an Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendant's Motion for Summary Judgment. The Court found that when applying a heightened form of discretionary review, commensurate with Plaintiff's evidence of Defendant's conflicts of interest, Defendant did not abuse its discretion in concluding that Plaintiff was not suffering from the physical ailments that Plaintiff claimed.

The Court writes to clarify the January 8, 2009 Order in light of the Ninth Circuit's recent ruling in *Nolan v. Heald College*, 551 F.3d 1148 (9th Cir.2009). In *Nolan*, the Ninth Circuit held that "traditional rules of summary judgment" apply to ERISA claims such as this, and the district court erred by failing to view the evidence of conflict of interest in the light most favorable to the non-moving party. *Id.* at 1154–55. If the district court had taken such a view, the Ninth Circuit found it possible that the evidence of bias would have been material to the outcome of the case. *Id.* at 1155–56. Thus, the Ninth Circuit reversed the district court for failure to apply the appropriate principles of summary judgment.

Here, the Court applied traditional rules of summary judgment to the evidence of bias that Plaintiff presented in support of Plaintiff's case. To be clear, viewing the evidence of conflict in the light most favorable to the Plaintiff, the Court found that the appropriate standard of review was abuse of discretion, tempered with skepticism commensurate with the evidence of bias that Plaintiff had presented. Applying this standard to the Administrative Record, the Court found that Defendant did not abuse its discretion because Defendant's doctors adequately reviewed the record of Plaintiff's claimed physical ailments and determined that the evidence did not support such diagnoses. Thus, summary judgment was appropriately entered in Defendant's favor.